HARROW PRODUCTS, INC., a Delaware corporation; Leigh Products, Inc., a former Delaware corporation; and Universal Gerwin, a division of Harrow Products, Inc., Plaintiffs,

v.

LIBERTY MUTUAL INSURANCE COMPANY, Insurance Company of North America, Continental Insurance Company, American Insurance Company, and New England Insurance Company, Defendants.

Nos. 1:89–CV–967, 1:90–CV–811.

United States District Court,
W.D. Michigan, S.D.

Aug. 30, 1993.

Ignatius J. Melito, Siff Rosen, PC, New York City, J. Richardson Johnson, Early, Lennon, Fox, Thompson, Peters & Crocker, Kalamazoo, MI, for New England Ins. Co.

Thomas D. Allen, Kohl, Secrest, Wardle, Lynch, Clark & Hampton, Farmington Hills, MI, for American Ins. Co.

Robert E. Graziani, Timmis & Inman, Detroit, MI, Mark W. Peyser, Marco, Timmis & Inman, Grosse Pointe, MI, for Continental Ins. Co.

Paul R. Koepff, Mudge, Rose, Guthrie, Alexander & Ferdon, New York City, Gary L. Stec, Harvey, Kruse, Westen & Milan, PC, Grand Rapids, MI, for Ins. Co. of North America.

Walter A. Stewart, Manta & Welge, Philadelphia, PA, Reynolds A. Brander, Jr., Cholette, Perkins & Buchanan, Grand Rapids, MI, for Liberty Mut. Ins. Co.

## OPINION OF THE COURT

McKEAGUE, District Judge.

The plaintiffs, Harrow Products, Inc., Leigh Products, Inc., and Universal Gerwin, are three related corporate entities whose interests are, for present purposes, essentially identical. They seek a declaratory judgment to the effect that defendant insurance companies are obliged to defend and/or indemnify them in connection with claims that plaintiffs are responsible for certain groundwater contamination. All parties have moved for summary judgment.

I

## FACTUAL BACKGROUND

Plaintiffs, collectively referred to as Harrow Products, owned and operated a manufacturing facility in Saranac, Michigan, from the mid–1940's until 1985. The facility is adjacent to property owned by the Village of Saranac, where municipal water supply wells were located. In September 1982, Harrow Products learned that trichloroethylene ("TCE") had been detected by the Michigan Department of Health in the municipal water supply. The Michigan Department of Natural Resources ("MDNR") immediately undertook an investigation to determine the extent and source of the contamination. Harrow Products cooperated with the investigation, which included the installation of monitoring wells on Harrow Products' property. By letter dated February 27, 1985, Harrow Products received notice from the MDNR that its facility was the suspected source of the TCE contamination. Harrow Products notified its primary comprehensive liability insurer, Liberty Mutual Insurance Company,

of the potential claim on March 1, 1985. It appears Liberty Mutual was on the risk from at least 1964 until 1987. Under the only policies which the parties have been able to produce, covering the period from December 1, 1982, to December 1, 1987, Liberty Mutual provided defense and indemnification coverage for bodily injury, property damage and personal injury. The limits were $500,000 for bodily injury and personal injury, and $100,000 for property damage.

Liberty Mutual undertook Harrow Products' defense in the MDNR administrative proceedings. On January 21, 1987, the MDNR notified Harrow Products that its contamination of the Village of Saranac water supply was a violation of the Water Resources Commission Act, and requested a remediation plan. Liberty Mutual continued to defend Harrow Products in these matters until March 23, 1989, when it determined to deny coverage based on the applicable policy's pollution exclusion.

Harrow Products gave notice of its troubles to its excess liability insurers in December 1988, and January 1989. Defendant New England Insurance Company had issued four umbrella liability policies providing Harrow Products coverage during the period December 1, 1976 to December 1, 1980, for liability in excess of that covered by Liberty Mutual up to $5,000,000.[1] Defendant Continental Insurance Company provided similar excess liability coverage, up to $5,000,000, for the next two years, through December 1, 1982. Defendant American Insurance Company provided excess liability coverage during the period December 1, 1979, through December 1, 1982, for liability in excess of that covered by the underlying policies of New England and Continental up to an additional $5,000,000. And finally, defendant Insurance Company of North America ("INA") provided excess liability coverage from December 1, 1983 through December 1, 1985, for liability in excess of that covered by Liberty Mutual during that period, up to $20,000,000.

On October 19, 1989, the Village of Saranac filed a complaint against Harrow Products in this Court, *Village of Saranac v.*

1. The limit of New England's liability was only $2,000,000 during the first year of coverage.

*Harrow Products, Inc., et al.*, W.D.Mich. No. 1:89–CV–967, seeking damages and recovery of response costs under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), and the Michigan Environmental Protection Act ("MEPA"). Again, Liberty Mutual denied coverage and refused to defend Harrow Products. The excess carriers, too, refused to assume Harrow Products' defense. Hence, Harrow Products filed a third-party complaint against all five insurance companies for a declaration of its rights to coverage vis-a-vis the Village of Saranac claims.

Subsequently, this action was commenced on September 25, 1990, for a declaration of Harrow Products' rights to coverage vis-a-vis the concurrent MDNR administrative proceedings. The two actions have been consolidated. On January 22, 1991, the Village of Saranac claims against Harrow Products were dismissed after the parties agreed to settle them for $475,000.

The issues posed by the parties' cross-motions for summary judgment are essentially four:

(1) Is Harrow Products entitled to coverage, notwithstanding the pollution exclusion in each insurer's policy, either (a) because the complained of release or discharge of TCE was "sudden and accidental," or (b) because the claims brought against Harrow Products may be characterized as "personal injury" claims not affected by the pollution exclusion?

(2) To what extent are/were defendant insurers obliged to undertake Harrow Products' defense in the MDNR administrative proceedings and the Village of Saranac action?

(3) Was Harrow Products' notice to each insurer so untimely as to negate coverage?

(4) When is coverage properly deemed to have been triggered by the "occurrence" of TCE contamination?

## II

### SUMMARY JUDGMENT STANDARD

The parties' cross-motions for summary judgment ask the Court to evaluate the fac-

tual support for their claims and defenses. The Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Ind. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). The standard for determining whether summary judgment is appropriate is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.*, 477 U.S. at 247–248, 106 S.Ct. at 2510 (emphasis in original). If a movant carries its burden of showing there is an absence of evidence to support a claim or defense, then the opponent must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553–54, 91 L.Ed.2d 265 (1986). An issue of fact is "genuine" if the evidence is such that a reasonable jury could find for its proponent. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. An issue of fact concerns "material" facts only if establishment thereof might affect the outcome of the lawsuit under governing substantive law. *Id.* A complete failure of proof concerning an essential element of a claim or defense necessarily renders all other facts immaterial. *Celotex, supra*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

## III

### POLLUTION EXCLUSIONS

■ Of the issues presented, the applicability of the pollution exclusion is a threshold question. All of the insurance policies at issue contain a pollution exclusion substan-

tially similar to that contained in the Liberty Mutual policies:

> This policy does not apply:
>
> . . . .
>
> (f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental; . . . .[2]

There is no dispute that the MDNR proceedings and the claims of the Village of Saranac assert that Harrow Products is liable for releasing contaminants or pollutants into or upon land or any water course or body of water. Harrow Products contends, however, that the pollution exclusion contained in all policies does not apply to exclude coverage because there is evidence that the TCE contamination resulted from "sudden and accidental" spills. The nature of the evidence Harrow Products relies on is not disputed; its significance is.

Bernard Medema was employed by Harrow Products from 1963 to 1985. He testified in deposition that TCE was used as a degreaser in Harrow Products' manufacturing operations. During the period 1964 to 1971, TCE waste product from a 150–gallon degreasing tank was commonly disposed of by dumping it down a plant floor drain or outside on the ground. Medema Dep.Tr., p. 38. In addition to routine disposal of TCE in this manner, Medema also testified that there could have been accidental spills of TCE during the course of handling, but he had never observed one. Id., at p. 156.

■ Alvin Smith was employed by Harrow Products from 1969 to 1985. He testified that he had personally dumped the waste product contents of the degreasing tank outside the plant on the ground once in 1969. Smith Dep.Tr., pp. 56–58. He also testified that his father, Art Smith, former plant superintendent, had told him that the contents of the degreasing tank had been drained into the courtyard outside the plant during the 1960's. Id., at pp. 60–61.[3]

Finally, Marcus Aurich was employed by Harrow Products during 1960 and 1961, and again from 1972 to 1974. He testified that during 1960–61, the degreaser tank residuals were sometimes disposed of in a barrel and "sometimes it just got pitched out the back door." Aurich Dep.Tr., p. 8. Also, there were occasional accidental spills of TCE indoors during that period, although Aurich

---

2. The pollution exclusions contained in the policies issued by New England for 1979 and 1980 and by Continental for 1981 and 1982, incorporated by reference into the American policies, exclude from coverage "any liability," not just bodily injury or property damage, arising from pollution that is not sudden and accidental. The significance of this difference is addressed *infra*.

3. This statement is one of several matters submitted by defendants in support of their motions for summary judgment, the admissibility of which Harrow Products has challenged in a motion to strike. Harrow Products contends Alvin Smith's deposition testimony concerning a statement made by his now deceased father is inadmissible hearsay. Notwithstanding the statement's apparent hearsay character, it is admissible under Fed.R.Evid. 801(d)(2)(D) as an admission by a party-opponent. *See Robert R. Jones Assoc., Inc. v. Nino Homes*, 858 F.2d 274, 276 (6th Cir.1988). It appears Alvin Smith's father, Art Smith, was employed by Harrow Products at the Saranac facility as plant superintendent and that his statement was made in the scope of and during the existence of this employment relationship. Moreover, the content of the statement appears to be cumulative of other clearly competent deposition testimony concerning the manner of TCE disposal. Furthermore, striking the statement would avail Harrow Products little, inasmuch as the utter absence of evidence of sudden and accidental releases persists. Harrow Products' motion to strike or preclude consideration of this part of Alvin Smith's deposition testimony will therefore be denied.

In addition, exhibits consisting of MDNR records to which Harrow Products objects for lack of foundation, have since been properly authenticated. The remainder of Harrow Products' motion to strike also lacks merit. Without considering particularly each of the items to which Harrow Products objects, let it suffice to say that none of them is significant. Those matters which have been considered at all are either cumulative or are considered only with respect to purposes for which their contents are reliable. See 6 Moore's Federal Practice (2nd ed.), ¶ 56.-11[1.–8], pp. 56–106 to 56–108 (technical rulings have no place in summary judgment procedure).

could not recall a specific incident. *Id.*, at pp. 36–37. The quantities spilled were sufficiently small so that they could be mopped up or allowed to seep into floor drains or cracks, or allowed to evaporate with the aid of a fan. *Id.*

This appears to be the sum total of the evidence concerning the manner of TCE releases by Harrow Products that could have contributed to the groundwater contamination. Defendants contend that it cannot, as a matter of law, be deemed to warrant a finding by a reasonable trier of fact that the subject TCE contamination was caused by a sudden and accidental release or discharge. Harrow Products maintains there remains a genuine issue of fact.

In this diversity action, the Court must apply Michigan law in accordance with the controlling decisions of the state's highest court. *FL Aerospace v. Aetna Casualty & Surety Co.*, 897 F.2d 214, 217 (6th Cir.1990), *cert. denied*, 498 U.S. 911, 111 S.Ct. 284, 112 L.Ed.2d 238 (1990). The Michigan Supreme Court has ruled that the terms "sudden" and "accidental" are clear and unambiguous. *Upjohn Co. v. New Hampshire Ins. Co.*, 438 Mich. 197, 208, 476 N:W.2d 392 (1991), (finding persuasive the reasoning employed in *U.S. Fidelity & Guaranty Co. v. Star Fire Coals, Inc.*, 856 F.2d 31 (6th Cir.1988); *U.S. Fidelity & Guaranty Co. v. Murray Ohio Mfg. Co.*, 875 F.2d 868 (6th Cir.1989); *FL Aerospace v. Aetna Casualty & Surety Co.*, *supra*). "Sudden" is defined as entailing a "temporal element that joins together conceptually the immediate and the unexpected." *Upjohn*, 438 Mich. at 207, 476 N.W.2d 392. "Accidental" means "occurring unexpectedly and unintentionally; by chance." *Id.*, at 207–08, 476 N.W.2d 392. "A sudden and accidental event is one that happens quickly, without warning, and fortuitously or unintentionally." *FL Aerospace, supra*, 897 F.2d at 219.

The deposition testimony of Harrow Products' own former employees indicates clearly that releases of TCE did not occur immediately, unexpectedly and unintentionally. They appear rather to have occurred routinely and intentionally in the regular course of business. Liability for such releases is excluded under the pollution exclusion. *U.S.*

*Fidelity & Guaranty Co. v. Star Fire Coals, Inc., supra*, 856 F.2d at 75; *Ray Ind., Inc. v. Liberty Mutual Ins. Co.*, 974 F.2d 754, 768 (6th Cir.1992). That there were or could also have been occasional accidental spills does not defeat this determination, for even they appear to have occurred in the regular course of business and cannot reasonably be characterized as abrupt or sudden events. See *id.; Industrial Indemnity Ins. Co. v. Crown Auto Dealerships, Inc.,,* 731 F.Supp. 1517, 1520–21 (M.D.Fla.1990).

■ Under Michigan law, Harrow Products must bear the burden of proving that the "sudden and accidental" exception to the pollution exclusion applies. *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.*, 702 F.Supp. 1317, 1328–29 (E.D.Mich.1988). The Court acknowledges that other courts, applying the law of other states, have reached a different conclusion on this question, holding that the insurer retains the burden of proving both the applicability of the pollution exclusion and the nonapplicability of the sudden and accidental exception. See *New Castle County v. Hartford Accident & Indemnity Co.*, 933 F.2d 1162, 1181–82 (3rd Cir.1991), (Delaware law), *cert. denied*, —— U.S. ——, 113 S.Ct. 1846, 123 L.Ed.2d 470 (1993); *Gould, Inc. v. Continental Casualty Co.*, 822 F.Supp. 1172, 1181–82 (E.D.Pa.1993) (Illinois law); *Colonial Tanning Corp. v. Home Indemnity Co.*, 780 F.Supp. 906, 919 (N.D.N.Y.1991) (New York law); *U.S. Fidelity & Guaranty v. Morrison Grain Co.*, 734 F.Supp. 437, 442–43 (D.Kan.1990) (Kansas law). Nonetheless, the Court finds that under the instant circumstances, the construction of Michigan law and reasoning employed in *Fireman's Fund Ins. Cos. v. Ex–Cell–O Corp.* represent the proper approach to the burden allocation question. That is, inasmuch as application of the sudden and accidental exception is dependent upon evidence that an unusual event occurred during the course of Harrow Products' operations—evidence that Harrow Products is more likely to possess or have access to—fairness dictates that Harrow Products be made to bear the burden of proof. *Id.*, at 1328. See also, following the *Ex–Cell–O* approach, *Northern Ins. Co. v. Aardvark Assoc.*, 942 F.2d 189, 195 (3rd Cir.

1991) (Pennsylvania law); *A. Johnson & Co. v. Aetna Casualty & Surety Co.*, 741 F.Supp. 298, 305 (D.Mass.1990) (Maine law); *Fischer & Porter Co. v. Liberty Mutual Ins. Co.*, 656 F.Supp. 132, 140 (E.D.Pa.1986) (Pennsylvania law).

Harrow Products has failed to carry this burden and has failed even to present evidence creating a genuine issue of material fact. Harrow Products' plea for more time to discover additional information garners no sympathy for it is in the best position to uncover such information and has already had abundant opportunity to do so. Harrow Products' failure to produce evidence of sufficient substance to create a genuine issue of material fact compels the conclusion that the sudden and accidental exception does not apply and that the pollution exclusion contained in each of defendants' policies excludes coverage.

## IV

### PERSONAL INJURY THEORY

■ Harrow Products challenges the pollution exclusion defense on a second ground. Referring to the language of the Liberty Mutual pollution exclusion, Harrow Products observes that it only excludes liability for bodily injury or property damage, not personal injury.[4] Noting that "personal injury" is defined in the Liberty Mutual policies as including injury arising out of "wrongful entry or eviction or other invasion of the right of private occupancy," Harrow Products contends that its liability in the MDNR administrative proceedings and in the Village of Saranac action arises out of a "personal injury." The contamination of groundwater is said to constitute a wrongful entry or eviction or other invasion of the right of private occupancy enjoyed by the people of the Village of Saranac and of the State of Michigan.

The theory is not devoid of support. That is, pollution which interferes with rights of private occupancy may be deemed a personal injury. In *Titan Holdings Syndicate v. City of Keene, N.H.*, 898 F.2d 265, 272–73 (1st Cir.1990), allegations that the defendant city's sewage treatment plant's noxious odors, noise and light had unreasonably and substantially interfered with the plaintiff homeowners' quiet enjoyment of their home and substantially deprived them of the use of their home were deemed to state a claim for invasion of the right of private occupancy. Similarly, PCB (polychlorinated biphenyls) contamination of the premises of a scrap metal processor and dealer that necessitated restriction of access to the property, has been held to arguably constitute an invasion of the right of private occupancy. *Pipefitters Welfare Educational Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1040–42 (7th Cir.1992). Further, TCE contamination allegedly resulting in interference with the property owner's comfortable use and enjoyment of its property has been held to potentially constitute an invasion of the right of private occupancy. *Hirschberg v. Lumberman's Mutual Casualty*, 798 F.Supp. 600, 604–05 (N.D.Cal.1992).

On the other hand, in *Gregory v. Tennessee Gas Pipeline Co.*, 948 F.2d 203, 209 (5th Cir.1991), the court held allegations that surface water contamination injured the plaintiffs' abutting property, did not make out a claim for "wrongful entry into premises that the person occupies." To extend personal injury coverage to pollution-related occurrences that fall squarely within the property damage coverage, the *Gregory* court reasoned, would have the effect of rendering the pollution exclusion meaningless; would have the effect of saddling the insurer with liability for a risk it had expressly excluded and for which it had charged no premium. *Id.*

The Court finds all of these authorities facially proper and arguably reconcilable. As a general proposition, the pragmatic reasoning of *Gregory* has appeal: the parties to a contract of insurance cannot reasonably be deemed to have intended that pollution-related injury to real property would be simulta-

---

4. As noted in footnote 2, *supra*, the pollution exclusions applicable to coverage under several policies issued by New England, Continental and American are different, excluding from coverage *any* liability—even personal injury liability—arising from pollution that is not sudden and accidental. Accordingly, this argument by Harrow Products, and the Court's following analysis do not apply to these three insurers for the years indicated in footnote 2.

neously excluded from coverage for property damage, but included in coverage for personal injury. Yet, neither is the Court inclined to quarrel with the reasoning employed in the former three cases, where the parties' intent was discerned not from the overall scheme of the policy's coverage, but from the plain language of its provisions.

None of these cases, however, supports Harrow Products' instant cause. Here, there is no reasonable basis for concluding that the liability Harrow Products is or may be made to bear in the MDNR administrative proceedings or in the Village of Saranac action is the result of wrongful entry or eviction or other invasion of the right of *private occupancy*. That these terms are used to define *"personal* injury," and are included among other torts or offenses to personal rights, such as false arrest, malicious prosecution, defamation and invasion of privacy, indicates that they pertain to a person's right to actually possess, inhabit or occupy real property. Here, unlike the *Titan, Pipefitters* and *Hirschberg* cases, no showing has been made that Harrow Products is threatened with liability for interfering with property owners' or occupants' rights of private occupancy. No private occupants of property have filed claims in either action. Nor has the MDNR or Village of Saranac asserted claims as subrogees of, or in some other representative capacity for, occupants of property. The MDNR and Village of Saranac actions, asserting claims under the Michigan Water Resources Commission Act, the Michigan Environmental Protection act, and CERCLA based on the "people's" interest in uncontaminated groundwater, cannot reasonably be characterized as premised upon interference with rights of private occupancy.

Accordingly, personal injury coverage is not implicated under any of the defendants' policies. It follows that the pollution exclusions contained in all of the subject insurance policies are effective to exclude Harrow Products' claims from all indemnification coverage. The broader parameters of the insurers' duty to defend, however, pose a different question.

## V

### DUTY TO DEFEND

Harrow Products contends the standards by which defendants' duty to defend must be measured are different from those applicable to their duty to indemnify. In *Protective Nat'l Ins. Co. of Omaha v. City of Woodhaven,* 438 Mich. 154, 159, 476 N.W.2d 374 (1991), quoting from *Detroit Edison Co. v. Michigan Mutual Ins. Co.,* 102 Mich.App. 136, 141–42, 301 N.W.2d 832 (1980), the Michigan Supreme Court adopted the following summary of these standards:

> The duty of the insurer to defend the insured depends upon the allegations in the complaint of the third party in his or her action against the insured. This duty is not limited to meritorious suits and may even extend to actions which are groundless, false, or fraudulent, so long as the allegations against the insured *even arguably* come within the policy coverage. The insurer has a duty to defend, despite theories of liability asserted against any insured which are not covered under the policy, if there are any theories of recovery that fall within the policy. *Dochod v. Central Mutual Ins. Co.,* 81 Mich.App. 63, 264 N.W.2d 122 (1978). The duty to defend cannot be limited by the precise language of the pleadings. The insurer has the duty to look behind the third party's allegations to analyze whether coverage is possible. *Shepard Marine Construction Co. v. Maryland Casualty Co.,* 73 Mich.App. 62, 250 N.W.2d 541 (1976). In a case of doubt as to whether or not the complaint against the insured alleges a liability of the insurer under the policy, the doubt must be resolved in the insured's favor. 14 Couch, Insurance, 2d (rev. ed.), § 51:45, p. 538 [now § 51:49, p. 489]. [Emphasis in original].

See also, *Upjohn Co. v. Aetna Casualty & Surety Co.,* 768 F.Supp. 1186, 1195–96 (W.D.Mich.1990). Accordingly, Harrow Products argues, notwithstanding the Court's analysis above concerning the pollution exclusion, that Liberty Mutual and the other defendants have been obliged to assume the costs of its defense in the MDNR administrative proceedings and the Village of Saranac

action, because both are premised upon allegations of occurrences that *arguably* come within the policy coverage.

■ Liberty Mutual contends first that the MDNR proceedings do not constitute a "suit" triggering its duty to defend. Indeed, Harrow Products' duty to defend Harrow Products applies under the policy language only to any "suit" against the insured for damages arising out of bodily injury or property damage to which the policy applies. It does not appear that formal administrative proceedings have been instituted by the MDNR against Harrow Products. Harrow Products received notice in February 1985, that the MDNR had identified it as a "potentially responsible party" in connection with the Saranac groundwater contamination. Harrow Products has cooperated with the MDNR's investigative and remediation efforts ever since.

In *Ray Industries, Inc. v. Liberty Mutual Ins. Co.*, 974 F.2d 754, 759–64 (6th Cir.1992), the court considered at length the question whether, under Michigan law, "potentially responsible party" ("PRP") notice from an administrative agency constitutes a "suit." While noting the existence of conflicting authorities in the Michigan appellate courts, the *Ray Industries* court nonetheless concluded that the Michigan Supreme Court would hold that a PRP letter does not constitute a suit and therefore does not trigger the duty to defend. The *Ray Industries* ruling is well-reasoned and binding upon this Court. That the Michigan Court of Appeals, in *Michigan Millers Mutual Ins. Co. v. Bronson Plating Co.*, 197 Mich.App. 482, 491, 496 N.W.2d 373 (1992), has subsequently disagreed with *Ray Industries* is of no consequence to this Court. *Ray Industries* controls. Accordingly, the Court holds as a matter of law that neither Liberty Mutual nor any of the excess carries has or had a duty to defend Harrow Products in the MDNR administrative proceedings.

■ Liberty Mutual also disclaims any duty to defend Harrow Products in the Village of Saranac action. Asserting the same arguments and facts which have persuaded the Court to hold the pollution exclusion effective to exclude indemnification coverage, Liberty Mutual contends the claims made by the Village of Saranac never even arguably came within the policy coverage. Liberty Mutual argues the Village of Saranac claims are clearly premised on property damage arising out of the "discharge, disposal, release or escape of pollutants." Thus, they are said to have clearly come within the ambit of the pollution exclusion, because there is no suggestion on the face of the allegations that the discharge, disposal, release or escape was sudden and accidental.

The Village of Saranac claims, embodied in four courts, are couched in the following terms:

> [O]perations carried on by Harrow Products, Inc., . . . . caused the contamination of the Village's well field. (Para. 17).

> [D]efendants owned and/or operated this facility at the time hazardous substances were disposed of at the facility. (Para. 21).

> By the deposit and release of hazardous substances on the Universal Gerwin property, defendants engaged in conduct that is likely to pollute, impair and/or destroy the air, water, and other natural resources of the State of Michigan and the area. (Para. 28).

> Since the initial deposit of hazardous substances, the substances have continuously migrated into the surrounding soil and groundwater. (Para. 36).

> By disposing of the hazardous substances in a manner that may be dangerous to health and the environment, and by allowing the substances to remain in the soil to pollute surrounding areas, the defendants have been in continuous violation of the aforementioned federal and state laws, thereby breaching their duties. (Para. 37).

These allegations do not affirmatively set forth any basis for finding that the discharge of TCE was sudden and accidental. Yet, neither do they preclude that possibility. The allegations are certainly broad and indefinite enough to encompass claims for recovery based on sudden and accidental discharges. Considering, as subsequent factual development has revealed, that the significant use and releases of TCE appear to have occurred in the 1960's, it is possible that neither the Village of Saranac nor the

MDNR nor Harrow Products nor Liberty Mutual had been able to definitely ascertain the manner of such releases when the action was commenced in October 1989.

Viewing the language of the complaint on its face, it is clear that claims arguably within the policy coverage are asserted. Liberty Mutual has not directed the Court, in looking behind the allegations, to any facts known at the time the complaint was filed that compel the conclusion that coverage was precluded.[5] Liberty Mutual had withdrawn from participation in the defense of Harrow Products in the administrative proceedings in March 1989, because it had satisfied itself that TCE releases had been intentional, routine and continuous. As support for the propriety of its decision to disclaim any duty to defend in March 1989, and then again in October 1989, however, Liberty Mutual directs the Court to the transcripts of depositions of Bernard Medema and Alvin Smith taken in July 1991, and of Marcus Aurich, taken in December 1991. Further, in argument in support of its own motion for summary judgment, Liberty Mutual contends that, despite having made numerous inquiries of Harrow Products officers concerning handling of TCE, "it was not until July 1991, at Liberty Mutual's first deposition of a Harrow Products employee, that Liberty Mutual learned of Harrow Products' method of disposal of TCE." Brief in support of motions for summary judgment, pp. 6–7. Thus, it appears the suspicions based upon which Liberty Mutual withdrew from participation in the defense as early as March 1989, did not become substantiated until July 1991.

Because the Village of Saranac claims arguably come within the policy coverage, Liberty Mutual was obliged to "undertake the defense until it could confine the claim to a recovery that the policy did not cover." *Polkow v. Citizens Ins. Co.*, 438 Mich. 174, 179, 476 N.W.2d 382 (1991).

The insurer's duty to provide a defense extends to allegations which even arguably come within the policy coverage. *Allstate Ins. Co. v. Freeman*, 432 Mich. 656, 443 N.W.2d 734 (1989). Fairness requires that there be a duty to defend at least until there is sufficient factual development to determine what caused the pollution so that a determination can be made regarding whether the discharge was sudden and accidental. Until that time, the allegations must be seen as "arguably" within the comprehensive liability policy, resulting in a duty to defend.

*Id.*, 438 Mich. at 180, 476 N.W.2d 382. Here, the Court has been presented no basis for concluding that the factual development was sufficient to determine that the sudden and accidental exception to the pollution exclusion was not applicable until July 1991.

▮▮▮▮ Liberty Mutual contends it should not be made to bear the burden of proving noncoverage. Inasmuch as the insured has the burden of proving the applicability of the sudden and accidental exception for purposes of indemnification, Liberty Mutual argues Harrow Products should for the same reasons also have the burden for purposes of the duty to defend. Yet, as noted, *supra*, determination of the duty to indemnify and the duty to defend are two distinct matters governed by different standards. The insurer is not entitled to proof that the insured would ultimately be entitled to indemnification before undertaking the defense. *Upjohn Co. v. Aetna Casualty & Surety Co., supra*, 768 F.Supp. at 1196. It is not incumbent upon the insured to try the facts in another action against the insurer in order to obtain a defense. *Id.* As long as the claims arguably come within the policy coverage; as long as there is doubt as to whether the claims come within coverage, the doubt must be resolved in favor of the insured and the insurer must be held obligated to assume its contractual duty to defend. *Id.* Only when policy language specifically and explicitly excludes coverage or when the *insurer*, through its investigation and defense of the claims, develops facts which do not merely reveal a basis for excluding coverage, but which remove all doubt about the possibility of coverage, is the

---

5. Cf. *Woodhaven, supra*, 438 Mich. at 161, 476 N.W.2d 374, where, notwithstanding the breadth of the underlying allegations, coverage was deemed precluded because the parties agreed that the release of pollutants was intentional and therefore not sudden and accidental.

insurer justified in withdrawing from the defense. *Id.*

Here, based on the record presented, it is apparent that this threshold was crossed in July 1991. After Medema had testified on July 22nd and 23rd, and Smith had testified on July 24th, there ceased to be an arguable basis for the possibility that Harrow Products' liability would be within the policy coverage. Until then, there was doubt about the possibility of coverage and Liberty Mutual was obligated to undertake Harrow Products' defense. Thereafter, the sworn deposition testimony of Harrow Products' own former employees had, in the face of no countervailing evidence, positively established that the TCE releases were intentional, routine and continuous, not sudden and accidental, and therefore excluded from coverage. Thus, Liberty Mutual, having disclaimed any duty to defend Harrow Products in the Village of Saranac action since its inception, may be liable to reimburse Harrow Products for defense costs incurred from October 19, 1989 to July 24, 1991.[6]

■ Harrow Products' argument that there has continued to be a possibility of coverage and therefore a continuing duty to defend, based on its personal injury theory is not persuasive. For the reasons stated in part IV of this opinion, the Court finds no reasonable basis for looking beyond the allegations of the Village of Saranac complaint and characterizing the claims as seeking redress for personal injury. The only arguable basis for the possibility of coverage is one that does injury to the plain language of the policy's definition of personal injury. For while the term "invasion of the right of private occupancy" is arguably ambiguous in some contexts, see *Titan, supra,* 898 F.2d at 272; *Pipefitters, supra,* 976 F.2d at 1040; *Hirschberg, supra,* 798 F.Supp. at 604, it cannot reasonably be construed so broadly as to encompass the sort of wrongs alleged in the Village of Saranac complaint, where rights of *private occupancy* play no role whatsoever. Harrow Products' personal injury theory thus represents no basis for hold-

ing Liberty Mutual obliged to defend beyond July 24, 1991.

■ The excess insurance carriers' duty to defend, if any, depending on the terms of each policy, generally arises only if and when the primary insurer's coverage is exhausted. See *Morbark Industries, Inc. v. Western Employers Ins. Co.,* 170 Mich.App. 603, 609–10, 429 N.W.2d 213 (1988), quoting *Continental Marble & Granite Co. v. Canal Ins. Co.,* 785 F.2d 1258, 1259 (5th Cir.1986). Inasmuch as the Court has ruled that Liberty Mutual's duty to indemnify is precluded by the pollution exclusion, there is no possibility that Liberty Mutual's property damage indemnification coverage limit of $100,000 will be exhausted. Further, there has been no suggestion that the defense expenses incurred by Harrow Products in connection with the Village of Saranac action from October 19, 1989 to July 24, 1991, for which Liberty Mutual may be liable, exceeded $100,000. Thus, under the general rule, it is apparent that the excess carriers' duty to defend did not and will not ever arise. Reference to the specific terms of the excess insurance policies confirms this conclusion.

All four policies issued by New England make its duty to defend expressly contingent upon the exhaustion of underlying insurance coverage by payment of judgment or settlement.

The Continental policies obligate Continental to defend Harrow Products only where it is charged with liability for an occurrence that is not covered by the underlying insurance, but is covered under the terms of the Continental policies. No such occurrence is presented here, for the pollution exclusion contained in the Continental policies is in relevant respects similar to and just as effective as Liberty Mutual's to exclude coverage.

The American policies provide no duty to defend coverage. What coverage is provided is subject to the same terms, conditions and exclusions as are contained in the underlying insurance policies of Liberty Mutual, New England and Continental.

---

6. Presumably, Harrow Products ceased incurring defense costs on January 22, 1991, when the Village of Saranac claims were dismissed pursu-
ant to settlement, but the Court leaves this matter to future factual development.

The INA policies create a duty to defend only (a) where Harrow Products is charged with liability for an occurrence that is not covered by the underlying insurance, but is covered under the terms of the INA policies; or (b) where the underlying insurance coverage has been exhausted. The first condition is not applicable because the INA pollution exclusion is co-extensive with the Liberty Mutual pollution exclusion. The second condition is not applicable because the underlying coverage has not been and will not be exhausted.

Accordingly, the Court rules as a matter of law that none of the excess carriers' duty to defend has been or will be triggered.

## VI

### TIMELINESS OF NOTICE

Liberty Mutual contends it has no liability, not even a duty to defend, because Harrow Products failed to give timely notice of the occurrence, thereby failing to satisfy a condition precedent to coverage. Liberty Mutual's policies each contain the following provisions:

In the event of an occurrence, written notice containing particulars sufficient to identify the insured and also reasonably obtainable information with respect to the time, place and circumstances thereof, and the names and addresses of the injured and of available witnesses, shall be given by or for the insured to the company or any of its authorized agents as soon as practicable.

It is agreed that Notice of Occurrence, Claim or Suit Conditions of the policy are amended to provide the Notice of Occurrence shall be given by or for the named insured to the Company or any of its authorized agents as soon as practicable after the Secretary and Assistant Treasurer of Leigh Products, Inc. located at 2627 E. Beltline, Grand Rapids, Michigan 49506, has actual knowledge of the occurrence.
. . . .
"Occurrence" means an accident, including continuous or repeated exposure to conditions, which results in bodily injury or property damage neither expected nor in-

tended from the standpoint of the insured;
. . . .

Thus, as a condition of coverage, Harrow Products was obliged to give Liberty Mutual written notice as soon as practicable after the Secretary and Assistant Treasurer of Leigh Products obtained actual knowledge of an occurrence, or an accident resulting in bodily injury or property damage neither expected nor intended.

Liberty Mutual contends Secretary and Assistant Treasurer Robert Bush had actual knowledge of the subject occurrence as early as December 1982. This contention is based largely on a memorandum authored by Michael DeYoung who occupied an industrial engineering position with Harrow Products. The memorandum is dated December 2, 1982, and is addressed to Robert Bush, among others. It advised that the MDNR had reached a "dead end" in its investigation of the source of the groundwater contamination, but pointed out "that the Village and D.N.R. think we might be the source."

Even on its face, this memorandum, while reflective of MDNR suspicions, hardly substantiates the conclusion that Bush thereby acquired actual knowledge that an occurrence had taken place. Further, to the extent that such an inference may be drawn from the memorandum, it is refuted by Bush's affidavit. In the affidavit, Bush disavows any knowledge that Harrow Products may have been responsible for the contamination until 1990, when hydrogeologic studies were completed. Until then, Bush states, Harrow Products' management assumed the TCE contamination was caused by neighboring Lack's Industries, whose operations had also included past use of TCE. Lack's Industries was also under investigation by the MDNR.

Compounding the problem is the fact that even as of this date, it is questionable whether evidence of a groundwater-contaminating "accident" has surfaced. The policy language defines "occurrence" essentially as an accident. In *Frankenmuth Mutual Ins. Co. v. Piccard,* 440 Mich. 539, 547, 489 N.W.2d 422 (1992), the Michigan Supreme Court

adopted the following definition of accident in this context:

> [A]n accident is an undesigned contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected.

As indicated at pp. 1243–1244, *supra*, Harrow Products has failed to present evidence sufficient even to create a genuine question as to whether the TCE releases were sudden and accidental, it appearing rather that TCE releases occurred routinely and intentionally in the regular course of business. This failure is fatal to Harrow Products' claims for indemnification coverage. The lack of evidence that the releases occurred by chance or out of the usual course of things also undercuts Liberty Mutual's contention that Bush had actual knowledge of an "occurrence" as early as December 1982.

Harrow Products gave notice to Liberty Mutual on March 1, 1985, within two days after it received a letter from the MDNR indicating that the highest concentration of TCE contamination in the Village of Saranac wells was located across the street and down-gradient from the Harrow Products Saranac facility. Until that time, the MDNR's investigation to determine the source of the TCE contamination had been ongoing since approximately September 1982. Until that time, Harrow Products contends, it had been identified by the MDNR as one of three possible sources of the TCE contamination. However, Harrow Products' management did not believe that its Saranac plant operations could be the source because significant TCE use had been discontinued long ago, and because its own investigation revealed that TCE had, for the most part, been handled carefully and appropriately.

Liberty Mutual contends this position is not credible and points to the deposition testimony of Bernard Medema, Alvin Smith and Marcus Aurich, as well as other indications that Harrow Products knew or should have known that its use of TCE could very well have been a contributing cause of the contamination, implicating Liberty Mutual's coverage. In view of this knowledge, Liberty Mutual contends Harrow Products' notice in March of 1985 came over two years late. Had notice been timely given, Liberty Mutual contends, it could have conducted an earlier and more effective investigation and could have earlier developed facts absolving it of responsibility for both defense and indemnification coverage.

The Court is satisfied that the DeYoung memorandum, coupled with the competent and reliable portions of Medema's, Smith's and Aurich's deposition testimony, is sufficient to create a reasonable inference that Bush knew or should have known that Harrow Products' use of TCE could have been a contributing cause of the contamination. This justifiable inference stands in opposition to Bush's affidavit and is sufficient to create a genuine issue of fact concerning the extent of Bush's actual knowledge. Admittedly, as indicated, the possibility that Bush knew Harrow Products' responsibility for the contamination was or might reasonably likely have been the product of an "accidental occurrence" is speculative. However, based on the present record, the Court is unwilling to rule either way as a matter of law concerning a matter as subjective as a man's state of mind where the evidence is controverted and inconclusive.

■■■■■■■ There remains a genuine issue of fact also with respect to whether Liberty Mutual was prejudiced by the "tardiness" of Harrow Products' notice. Under Michigan law, late notice to an insurance company will not eliminate an insurer's obligations under a policy unless the insurer can demonstrate that it has been prejudiced by the delay. *West Bay Exploration v. AIG Specialty Agencies*, 915 F.2d 1030, 1036 (6th Cir.1990). Prejudice will be found where the delay materially impairs an insurer's ability to contest its liability to an insured or the liability of the insured to a third party. *Id.*, at 1036–37. While the question of prejudice is generally to be left to the trier of fact, where the facts are so clear that one conclusion only is reasonably possible, the question is one of law. *Id.*, at 1037. However, where the delay is lengthy, prejudice may be presumed. *Id.*, at 1037–38.

Consistent with these principles, Liberty Mutual asks the Court first to find that

prejudice should be presumed because notice was given over two years late. Yet, the timeliness of Harrow Products' notice can only be determined with reference to the time when Secretary and Assistant Treasurer Bush acquired actual knowledge of the occurrence. Because a genuine issue of fact remains concerning the extent of Bush's knowledge prior to March 1985, the Court cannot find as a matter of law that Harrow Products' notice was so untimely as to give rise to a presumption of prejudice.

Liberty Mutual maintains its prejudice need not be presumed. Actual prejudice is said to be made out by the facts that the delay of notice deprived Liberty Mutual of the opportunity to conduct a prompt investigation when persons' memories were freshest and physical and documentary evidence most available. In fact, Liberty Mutual contends that during the period of delay, the person who was arguably the most knowledgeable about Harrow Products' TCE handling, Art Smith, died, and documents regarding plant operations were destroyed.

Such circumstances may indeed constitute actual prejudice, see *West Bay, supra,* 915 F.2d at 1037; *Wehner v. Foster,* 331 Mich. 113, 120, 49 N.W.2d 87 (1951), and the Court is not unconcerned about them. Yet, in view of the fact that Liberty Mutual did assume Harrow Products' defense from March 1985 to March 1989, and did not apparently uncover sound substantiation for its later denial of coverage until July 1991, it is far from clear that earlier notice would have enabled Liberty Mutual to earlier justify withdrawal from participation in Harrow Products' defense. Notwithstanding the delay, Liberty Mutual has ultimately been able to extricate itself from coverage under the policy. The question is simply whether, given timely notice, it would have been able to do so earlier. Based on the present record, the answer to this question is a matter of speculation.

As observed in *West Bay,* the question of prejudice is properly answerable as a matter of law only "where the facts are so clear that one conclusion only is reasonably possible." *Id.* Here, questions of fact remain. Accordingly, Liberty Mutual's motion for summary judgment based on the untimeliness of notice must be denied.

## VII

### TRIGGER OF COVERAGE

Liberty Mutual has also asked the Court to rule as a matter of law that the coverage it is responsible for is limited to that provided in its policy for the year December 1, 1981 to December 1, 1982. The argument is based on *Transamerica Ins. Co. of Michigan v. Safeco Ins. Co.,* 189 Mich.App. 55, 472 N.W.2d 5 (1991), where the Court ruled that coverage is triggered by manifestation of damage during a policy period. Liberty Mutual contends the groundwater contamination became known in September 1982.

The law recognizes at least four possible trigger-of-coverage theories. Which theory ought to be invoked in this case under Michigan Law, *Transamerica* notwithstanding, is not a simple question. See *Ray Industries, supra,* 974 F.2d at 764–66; *Marathon Flint Oil Co. v. American States Ins. Co.,* 810 F.Supp. 850, 852–53 (E.D.Mich.1992). Yet, inasmuch as the Court has ruled that there is no indemnification coverage under any of the Liberty Mutual policies, and inasmuch as Liberty Mutual's duty to defend is apparently defined identically in all of the policies, and is limited to the period October 19, 1989 to July 24, 1991, the trigger of coverage question is immaterial, and need not be addressed.

## VIII

### CONCLUSION

Thus, the Court concludes that none of the defendants has a duty to indemnify Harrow Products with respect to any liability it has been or may be made to bear in either the MDNR administrative proceedings or the Village of Saranac action. Each insurer's pollution exclusion is effective to exclude indemnification coverage. Further, none of the defendant insurers has a duty to defend Harrow Products with respect to the MDNR administrative proceedings. Only defendant Liberty Mutual is possibly subject to a duty to defend with respect to the Village of Sara-

nac action. This duty is limited to assumption of Harrow Products' defense during the period October 19, 1989 to July 24, 1991. The determination of the existence of this duty is dependent upon resolution of questions concerning (a) the extent of Secretary and Assistant Treasurer Bush's actual knowledge that an "occurrence" had occurred; (b) whether Harrow Products gave Liberty Mutual notice thereof as soon as practicable thereafter; and (c) if not, whether Liberty Mutual was prejudiced in its investigation and determination of coverage as a result of any delay.

An order consistent with this opinion shall issue forthwith.