KENT COUNTY v HOME INSURANCE COMPANY

Docket No. 165248. Submitted October 18, 1995, at Grand Rapids. Decided
      June 21, 1996, at 9:00 A.M. Leave to appeal sought.

      Kent County brought an action in the Kent Circuit Court against
         Home Insurance Company, Great American Insurance Company,
         and others, seeking a declaration regarding the defendants' duty to
         defend and indemnify it in connection with any action that might
         be taken by the Department of Natural Resources with regard to
         the cleanup of the plaintiff's landfill to halt the flow of contami-
         nants from the landfill into the groundwater. The plaintiff operated
         the solid waste landfill from 1972 to 1978 and stopped burying
         waste at the landfill in 1977. The plaintiff alleged that the landfill
         was a state of the art facility when it began operating and that it
         was designed to contain the solid waste. Although it was not artifi-
         cially lined, it had a seven-foot soil barrier that separated the bot-
         tom from the groundwater. No complaints were received during its
         operation; however, two years after it closed, the plaintiff began
         receiving complaints from neighbors of the landfill regarding con-
         taminants in the water in their wells. The plaintiff alleged, in part,
         coverage under comprehensive general liability policies (primary
         policies) and excess liability policies issued by Home and under a
         general liability policy issued by Great American. Home's primary
         policies contained a pollution exclusion, but the exclusion was not
         applicable if the discharge, dispersal, release, or escape of the pol-
         lutants was neither expected nor intended by the insured. Home's
         primary policies also contained a personal injury liability endorse-
         ment providing coverage for personal injury arising from wrongful
         entry or eviction, or other invasion of the right of private occu-
         pancy. Home's excess liability policies also contained a pollution
         exclusion, but the exclusion was not applicable if the discharge,
         dispersal, release, or escape of the pollution was sudden and acci-
         dental. Great American's policy contained a pollution exclusion,
         but the exclusion was not applicable if the discharge, dispersal,
         release, or escape of the pollution was sudden and accidental. The
         trial court, Robert A. Benson, J., granted summary disposition for
         the defendants, applying the "initial discharge" rule of *Protective
         Nat'l Ins Co of Omaha v Woodhaven*, 438 Mich 154 (1991). The
         court reasoned that the plaintiff intentionally placed the waste in

the ground and that the fact that toxic material thereafter migrated to neighboring wells was irrelevant to the application of the pollution exclusion under *Woodhaven*, because it is the initial discharge or dispersal of the waste that triggers the exception to the pollution exclusion clauses. The trial court found no genuine issue of material fact regarding the source of the contamination, that no coverage was afforded the plaintiff under the personal injury liability endorsement, and that the claim against Great American was barred because there was no manifestation of damage or injury during the period of coverage. The plaintiff appealed with regard to Home and Great American.

The Court of Appeals *held*:

1. The trial court did not err in concluding that no genuine issue of material fact remained with regard to the source of the contamination found by the Department of Natural Resources.

2. Summary disposition was properly granted with regard to Great American's policy and the Home excess liability policies, which contained the "sudden and accidental" exception to the pollution exclusion, whether the relevant discharge is considered to be the plaintiff's initial placement of the waste in the landfill or the subsequent discharge of pollutants into the groundwater. The sudden and accidental exception to the pollution exclusion clauses is not triggered here because there was no evidence that either the plaintiff's initial placement of municipal waste in the landfill or the subsequent contamination of the groundwater had the temporal element required, i.e., was immediate, abrupt, or occurred quickly.

3. With regard to Home's primary policies, the trial court erred in its application of *Woodhaven*'s "initial discharge" rule. Application of the pollution exclusion exception requires that the court focus on the initial discharge into the environment. If the discharge is intended, there is no coverage, notwithstanding that the damage may have been unintentional. Where the initial placement of the contaminants is into a container that is expected to securely confine them, the focus is on the release of the contaminants into the environment from the container. If waste materials are placed in a contained area or structure and later escape into the environment, the latter discharge is the relevant discharge. This matter must be remanded to the trial court for a determination whether the plaintiff either expected or intended the discharge, dispersal, release, or escape of the pollutants into the environment from the landfill. Coverage cannot be excluded until this is determined. Home has a duty to defend until coverage under the policies is excluded.

4. The trial court properly ruled that because this case does not involve the infringement of a private right of occupancy, but,

rather, involves a site-remediation request from a governmental regulatory agency, the Home policies' personal injury liability endorsement did not afford coverage.

Affirmed with regard to Great American Insurance Company and the Home Insurance Company excess liability policies. Reversed and remanded with regard to the Home Insurance Company primary policies.

1. INSURANCE — POLLUTION EXCLUSION — SUDDEN AND ACCIDENTAL RELEASE EXCEPTION.

The insurer of a solid waste landfill has no duty to defend or indemnify its insured with regard to the pollution of groundwater by the landfill where the policy contains a pollution exclusion that applies unless the release of the pollution is sudden and accidental and there is no evidence that either the insured's placement of the solid waste in the landfill or the subsequent contamination of the groundwater had the temporal requirement for application of the sudden and accidental exception, i.e., that the release was immediate, abrupt, or occurred quickly.

2. INSURANCE — POLLUTION EXCLUSION — UNEXPECTED AND UNINTENDED DISCHARGE EXCEPTION — INITIAL DISCHARGE.

A court must focus on the initial discharge of pollution into the environment to determine if an insurance policy's pollution exclusion denies coverage where the pollution exclusion does not apply if the discharge is neither expected nor intended by the insured; where the initial discharge into the environment is intended, there is no coverage, even if the damage is not intended; where waste materials are placed in a contained area or structure and they later escape into the environment, the relevant or initial discharge is the release of the pollutants from the contained area or structure.

3. INSURANCE — PERSONAL INJURY — INVASION OF RIGHT OF PRIVATE OCCUPANCY — POLLUTION — GOVERNMENTAL SITE-REMEDIATION REQUEST.

A site-remediation request from a governmental regulatory agency arising out of the alleged contamination of the state's groundwater by pollution from an insured's property does not involve the infringement of a private right of occupancy so as to afford the insured coverage under a policy's personal injury endorsement that obligates the insurer to pay damages for injury arising out of wrongful entry, eviction, or other invasion of the right of private occupancy.

*Varnum, Riddering, Schmidt & Howlett* (by *Mark S. Allard*), for Kent County.

*Roberts, Betz & Bloss, P.C.* (by *David Bloss* and *Ralph M. Reisinger*), for Home Insurance Company.

*Kluczynski, Girtz & Vogelzang* (by *Richard Radke, Jr.*, and *Ella S. Parker*), for Great American Insurance Company.

Amicus Curiae:

*Kelley, Casey & Clarke, P.C.* (by *Stephen M. Kelley*), for Insurance Environmental Litigation Association.

Before: HOLBROOK, JR., P.J., and WHITE and L.F. SIMMONS, JR.,* JJ.

WHITE, J. Plaintiff appeals as of right the circuit court's grant of summary disposition for defendants Home Insurance Company (Home) and Great American Insurance Company (Great American) pursuant to MCR 2.116(C)(10).[1] The circuit court dismissed plaintiff's complaint for a declaratory judgment, which alleged that defendants had a duty to defend and indemnify it in connection with any action that might be taken by the Michigan Department of Natural Resources (DNR) pertinent to the cleanup of plaintiff's landfill. We affirm in part and reverse in part.

I

This case involves interpretation and application of pollution exclusion clauses and a personal injury endorsement in insurance policies plaintiff purchased applicable to its solid waste landfill in Sparta Township. Plaintiff operated the Sparta landfill from approximately 1972 until October 1978. It stopped

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] The remaining defendants are not part of this appeal.

burying waste at the landfill in June 1977, and from that time until October 1978 the site was used only as a transfer station.

Plaintiff filed an action for a declaratory judgment against Home in April 1985. Plaintiff alleged that on March 8, 1983, the DNR claimed plaintiff was in violation of 1929 PA 245 and required that remedial action be taken to halt the flow of contaminants from the Sparta landfill into the groundwater.[2] Plaintiff further alleged that, although Home had defended it against claims by individual neighboring landowners and entered into settlements with those landowners for contamination of their groundwater aquifers, it acted in bad faith by waiting more than eighteen months to respond to and deny claims regarding the DNR action. Plaintiff alleged coverage under both the comprehensive general liability policies (primary policies) and excess liability policies issued by Home. Home's answer raised affirmative defenses, including defenses based on the pollution exclusion clauses contained in its policies.

Home's primary policies, which were in effect from January 24, 1975, to January 1, 1982, contained the following exclusion:

> This policy does not apply:

---

[2] The March 8, 1983, letter from the DNR stated that it had completed the hydrogeological study at the Sparta landfill and that

> this study and data obtained from the Kent County Health Department show conclusively that the landfill is the source of the organic chemicals and other contaminants which have been detected in samples from monitoring wells, and which have rendered water in the private wells at four nearby residences unfit for consumption.

*        *        *

(j) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is neither expected nor intended by the Insured;

Home's excess liability policies, which were effective from January 15, 1976, to January 15, 1980, contained a different exclusion:

It is agreed that such insurance as is afforded by this policy does not apply to Personal Injury or Property Damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

Home's primary policies contained a personal injury liability endorsement providing in pertinent part:

This Company will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of injury (herein called "personal injury") arising out of one or more of the following offenses:
Group A-false arrest, detention or imprisonment, or malicious prosecution;
Group B-the publication or utterance of a libel or slander or of other defamatory or disparaging material, or a publication or utterance in violation of an individual's right of privacy; except publications or utterances in the course of or related to advertising, broadcasting or telecasting activities conducted by or on behalf of the Named Insured;

> Group C-wrongful entry or eviction, or other invasion of the right of private occupancy; if such offense is committed during the policy period within the United States of America, its territories or possessions, or Canada, and this Company shall have the right and duty to defend any suit against the Insured seeking damages on account of such personal injury even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but this Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of this Company's liability has been exhausted by payment of judgments or settlements.

Great American was added as a necessary party in January 1988 and was required to answer plaintiff's amended complaint.[3] Great American issued a general liability insurance policy to plaintiff covering from July 24, 1972, to July 24, 1975. Great American's affirmative defenses included reliance on its pollution exclusion clause, which stated:

> It is agreed that the insurance does not apply to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants and pollutants into or upon the land, the atmosphere, or any watercourse or body of water; but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

In June 1992, Home moved for summary disposition pursuant to MCR 2.116(C)(10), arguing there was no issue of fact that the pollution exclusion clauses of its policies excluded coverage. Home argued the land-

---

[3] Plaintiff's third amended complaint, filed subsequently, named Great American.

fill was located in an area of highly permeable sand and gravel with the water table approximately ten feet below the surface. Home argued that there was no barrier between the soil and refuse, and that the municipal trash and some industrial sludge was deposited directly onto the land.

Great American moved for summary disposition, arguing its policies did not afford coverage because the contamination was not sudden and accidental and that its policy period ended before the "occurrence" in this case.

The facts viewed in a light most favorable to plaintiff[4] are that at the time the Sparta landfill began operating, it was a state of the art facility licensed to receive solid waste only. Operation of the landfill was part of a plan to eliminate twenty- nine open dumps in the county. Solid waste materials were deposited daily, covered throughout the day, and covered with six inches of dirt each night.

The landfill was not artificially lined. Rather, a seven-foot soil barrier separated the bottom of the landfill from groundwater. Plaintiff argued that at the time the landfill was engineered it was believed its design was sufficient to contain the solid waste and that it was "not an unlined pit or seepage lagoon," as asserted by Home.

---

[4] Plaintiff's appellate brief refers to deposition excerpts that are not attached and that we have not found in the record. Plaintiff states in footnote three of its appellate brief that all the depositions referred to therein were provided to the trial court in support of or in opposition to motions in the trial court. Defendant Home's trial court brief also makes reference to deposition transcripts apparently provided to the trial court. There are no entire deposition transcripts before us. The record before us contains multiple summary disposition motions and briefs in opposition of a number of defendants, including those dismissed, with numerous exhibits, and only select pages of various depositions.

When the landfill reached its capacity in 1977, it was closed. No complaints were received regarding the Sparta landfill during its operation. Approximately two years after the landfill closed, plaintiff began receiving complaints from neighbors of the landfill regarding their well water.[5]

In response to Home's motion, plaintiff argued that before the applicability of the pollution exclusion clauses could be determined, two factual issues required resolution: whether plaintiff intended to contain the waste within the landfill and whether the landfill was in fact the contributing source of the contamination. Plaintiff argued that William Iverson, an employee of the DNR, testified in a deposition that he could not attribute the contamination just to the Sparta landfill. Plaintiff also argued that coverage should be afforded under Home's personal injury liability endorsement, quoted earlier.

Home's reply brief argued that plaintiff's "state of the art" and source of contamination arguments were irrelevant because the key factual inquiry was whether plaintiff expected and intended to initially discharge the waste into or upon the land. Home argued that the personal injury coverage did not apply to governmental site-remediation claims.

The trial court's opinion and order granting defendants' motions set forth a chronological account of the events pertinent to this case, which is not disputed:

---

[5] Plaintiff's answers to interrogatories indicate it was first advised around June 1, 1979, that the DNR was investigating the possibility that the contaminants found in the neighboring private wells might have come from the Sparta landfill.

In April of 1979 homeowners, directly across the street from the Sparta Landfill, filed a complaint with the Kent County Health Department regarding the quality of water from their private residential well. An employee of the Kent County Health Department visited the property on April 18, 1979, and recommended that the Andersons (the homeowners) contact the Michigan Department of Natural Resources. On May 25, 1979 the Andersons were advised not to drink their well water. In a memorandum dated May 30, 1979 the Michigan Department of Natural Resources identified the closed Sparta Landfill as the "probable source" of the contamination. In June and July of 1979, the MDNR collected water samples from domestic wells in the immediate vicinity of the landfill and from some on-site monitoring wells to determine the extent of the contamination. In a letter dated August 28, 1979 the MDNR again reiterated that the most probable source of the adverse impact on the ground water in this area was the closed Sparta Landfill.

On August 28, 1979 the County was directed by the MDNR to undertake certain corrective actions. The County, in response to that directive, did install two deep wells at homes which were across the street from the Sparta Landfill but refused to comply with any other of the directives of the MDNR and instead took the position, that since the landfill had been closed with the knowledge and approval of the MDNR, and since the County had complied with all regulation[s] in existence at the time the landfill was closed, any further investigation and effort would have to be at the expense of the State. The MDNR subsequently conducted a hydrogeological investigation of the Sparta Landfill between January 1981 and November of 1982. On March 8, 1983 the MDNR wrote to the County advising that the hydrogeological study of the closed Sparta Landfill had been completed. A copy of the report was forwarded to the County. The MDNR letter reported that the results of the study and data obtained from the Kent County Health Department show that the landfill was the source of the "organic chemicals and other contaminates which had been detected in samples from monitoring wells, and which had rendered water

in the private wells [of] four nearby residents unfit for consumption." The March 8, 1983 letter also informed the County that the contamination of the ground water resulting from the landfill was a violation of Act 245, PA 1929 and that the matter had been referred to the [MDNR's] Enforcement Division. Notwithstanding the March 8, 1983 letter, the County has not conducted any remediation of the closed Sparta Landfill nor [sic], to the best of the Court's knowledge, has the MDNR taken any further steps.

The circuit court granted defendants' motions for summary disposition, applying the "initial discharge" rule of *Protective Nat'l Ins Co of Omaha v Woodhaven*, 438 Mich 154; 476 NW2d 374 (1991). The court reasoned that plaintiff intentionally placed the waste in the ground and that the fact that toxic material thereafter migrated to neighboring wells was irrelevant to the application of the pollution exclusion under *Woodhaven*, because it is the initial discharge or dispersal of waste that triggers the exception to the pollution exclusion. The trial court concluded there was no genuine issue of material fact regarding the source of contamination, because there was no other known or identified source. The same reasoning was applied in granting Great American's motion for summary disposition.

The circuit court subsequently denied plaintiff's motion for reconsideration, in which plaintiff again argued that a factual dispute remained regarding the source of contamination and that the court had not addressed whether there was coverage under Home's primary policies' personal injury liability endorsement. The circuit court found no coverage was afforded plaintiff under the personal injury liability endorsement, and further found that plaintiff's claim against Great American was barred because there

was no manifestation of damage or injury during the period of coverage.

II

We review de novo the circuit court's grant of summary disposition pursuant to MCR 2.116(C)(10).[6] *Borman v State Farm Fire & Casualty Co*, 198 Mich App 675, 678; 499 NW2d 419 (1993), aff'd 446 Mich 482; 521 NW2d 266 (1994). In ruling on the motion, the trial court must consider the pleadings and any depositions, affidavits, admissions, or other documentary evidence submitted by the parties. MCR 2.116(G)(5). The test is whether the kind of record that might be developed, giving the benefit of any reasonable doubt to the nonmoving party, would leave open an issue upon which reasonable minds might differ. *Kivela v Dep't of Treasury*, 200 Mich App 545; 505 NW2d 11 (1993), rev'd on other grounds 449 Mich 220; 536 NW2d 498 (1995). The party opposing the motion must show that a genuine issue of disputed fact exists. *Tope v Howe*, 179 Mich App 91; 445 NW2d 452 (1989).

Plaintiff first argues that summary disposition was inappropriate because a genuine issue of material fact remained regarding the source of contamination found by the DNR. We disagree. The DNR's hydrogeological study, as described in its March 8, 1983, letter to plaintiff, states that the "study and data obtained from the Kent County Health Department *show conclusively* that the landfill is the source of the organic

---

[6] Home's motion was brought under MCR 2.116(C)(10). Although Great American's motion was brought under MCR 2.116(C)(8) and (C)(10), it is clear the trial court considered documentary evidence beyond the pleadings in ruling on both motions.

chemicals and other contaminants which have been detected in samples from monitoring wells, and which have rendered water in the private wells at four nearby residences unfit for consumption." Defendants relied on this study in seeking summary disposition. Plaintiff states in its appellate brief that no further determinations regarding other sources of contamination have been made. Although the deposition testimony plaintiff relies on suggests that there may have been additional sources of contamination of the wells, it does not refute that some contamination came from the Sparta landfill.[7] Further, the alternative theories of the source of the pollution proffered by plaintiff do not support a claim for which there would be coverage under the policies. Under these circumstances, we conclude the trial court did not err in concluding that no genuine issue of material fact remained with regard to this issue.

III

Plaintiff next argues that because the Sparta landfill was designed to contain waste materials and contaminants, the initial placement of the waste in the landfill cannot be used to trigger the pollution exclusion clauses. Plaintiff argues the appropriate focus should

---

[7] Plaintiff relatedly argues that remand is necessary because the trial court improperly made a specific finding regarding the credibility of testimony, pointing to the trial court's statement in its opinion and order that

[d]espite the years the parties have had to do discovery and despite some "suggestions" by the County to this Court, there is no credible evidence which would indicate that anything other than the Sparta Landfill is the source of contamination in the ground water.

We conclude that although the trial court used the word credible, it did not err in concluding that no facts were presented to create a genuine issue of material fact.

be on the discharge or release of contaminants from the landfill into the general environment, and not the initial placement of waste into the landfill.

Whether we consider the relevant discharge to be plaintiff's initial placement of the municipal waste in the landfill, or the subsequent discharge of pollutants into the groundwater, summary disposition was properly granted with regard to the policies with pollution exclusion clauses containing the "sudden and accidental" exception, i.e., Great American's policy and the Home excess policies. Two of three companion cases in which the Supreme Court interpreted pollution exclusion clauses held that the "sudden and accidental" language in those policies was unambiguous. *Upjohn Co v New Hampshire Ins Co*, 438 Mich 197, 208; 476 NW2d 392 (1991); *Woodhaven, supra,* 438 Mich 167.[8] Subsequently, the Court in *Auto-Owners Ins Co v City of Clare,* 446 Mich 1, 12-13; 521 NW2d 480 (1994), quoting *Upjohn* at 207, again found that the "sudden and accidental" language in the insurer's pollution exclusion clause was unambiguous:

> "[W]hen considered in its plain and easily understood sense, 'sudden' is defined with a 'temporal element that joins together conceptually the immediate and the unexpected.' The common, everyday understanding of the term 'sudden' is ' "happening, coming, made or done quickly, without warning or unexpectedly; abrupt." ' " [Citations omitted.]

The "sudden and accidental" exception to the pollution exclusion clauses is not triggered here because

---

[8] The pollution exclusion clauses at issue in *Upjohn* and *Woodhaven* are virtually identical to the Great American clause and the Home excess policies clauses, quoted earlier. *Upjohn,* 438 Mich 206; *Woodhaven,* 438 Mich 160.

there was no evidence that either plaintiff's initial placement of municipal waste in the landfill or the subsequent contamination of the groundwater had the temporal element required, i.e., was immediate, abrupt, or occurred quickly. Thus, the trial court did not err in concluding Great American had no duty to defend or indemnify plaintiff and properly granted summary disposition for Great American.[9] The same applies to the Home policies containing pollution exclusion clauses with "sudden and accidental" exceptions, i.e., the four excess policies.

We decline to address plaintiff's argument that these policies' pollution exclusion clauses contain a latent ambiguity and that we should consider the drafting history of the pollution exclusion, because a majority of the Supreme Court in *Upjohn* rejected this approach. 438 Mich 205-206, n 6.

IV

We thus turn to the remaining policies, Home's three comprehensive general liability primary policies, each of which states that the policy does not apply

to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalis, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any water course or body of water; but this exclusion does not apply

[9] In light of our disposition, we need not reach plaintiff's argument that the trial court erred in ruling that coverage under Great American's policy was barred because the contamination did not manifest itself until after the policy expired on July 24, 1975.

if such discharge, dispersal, release or escape *is neither expected nor intended by the insured.*[10]

Plaintiff argues the trial court erred in its application of *Woodhaven*'s "initial discharge" rule. We agree.

A

In *Woodhaven*, a third party brought suit alleging injury as a result of exposure to pesticide the city regularly sprayed as part of its service to control insects and pests. 438 Mich 156. The city's insurer brought an action for a declaratory judgment, asserting that its policy's pollution exclusion clause applied and absolved it of any duty to indemnity or defend the city in the underlying action. The insurer's policy contained a "sudden and accidental" exception to the pollution exclusion clause. The Court noted that the lower courts and both parties agreed that the release of the pesticide into the atmosphere was intentional, and not sudden and accidental. *Id.* at 163. The only argument made by the City of Woodhaven, and by the Court of Appeals in ruling in its favor in an unpublished opinion per curiam, was that coverage was possible because, arguably, the dispersal or escape of the pesticide to an area where it came in contact with the injured person's skin was sudden and accidental, i.e., a sudden gust of wind may have blown the pesticide into the injured person's window. *Id.* at 161. The Court concluded that the proper focus is on the initial discharge, dispersal, release, or escape into the atmosphere, and not the subsequent migration.

---

[10] Plaintiff's appellate brief correctly notes that this exclusion clause differs from those at issue in the *Upjohn* trilogy.

In announcing and applying the initial discharge rule in *Woodhaven, id.* at 162, the Court relied on three cases:

> In *Travelers Indemnity Co v Dingwell*, 414 A2d 220, 225 (Me, 1980), the Supreme Court of Maine held that "[t]he behavior of the pollutants in the environment, *after* release, is irrelevant to [the application of the pollution exclusion]." (Emphasis in original.) Similarly, in *Technicon Electronics Corp v American Home Assurance Co*, 74 NY2d 66; 544 NYS2d 531; 542 NE2d 1048 (1989), the Court of Appeals of New York upheld the finding of the Supreme Court, Appellate Division, that "the logical and proper application of the pollution exclusion depends solely upon the method by which the pollutants entered the environment . . . ." *Technicon Electronics Corp v American Home Assurance Co*, 141 AD2d 124, 144; 533 NYS2d 91 (1988). See also *Fireman's Fund Ins Cos v Ex-Cell-O Corp*, 662 F Supp 71, 75 (ED Mich, 1987) ("[a]pplication of the pollution exclusion depends exclusively upon the process by which pollutants entered the environment"). We agree.

The Court concluded at 162-163:

> Applying this logic to the facts of this case, we conclude that the application of the pollution exclusion depends exclusively on the discharge, dispersal, release, or escape of the pesticide into the atmosphere. The behavior of the pesticide in the environment, after this initial release, is irrelevant. Furthermore, since the release of the pesticide by Woodhaven into the atmosphere was intentional, it cannot, as a matter of law, be accidental.

After *Woodhaven,* in *Clare, supra,* the Supreme Court declined to address the question of the applicability of the initial discharge rule in a case involving the escape of contaminants from a landfill and a pollution exclusion clause with "sudden and accidental" language. *Clare,* 446 Mich 11-12, n 10, 15, n 12. *Clare*

involved contamination from a landfill, whose license had not been renewed. The DNR had for years told the city that its landfill did not meet legal requirements and the better course would be to close and seal it. The Court concluded that the city must have expected the release of pollutants and, therefore, the sudden and accidental exception did not apply. *Id.* at 14.

The circuit court in *Clare* had noted that that case arose from the release of contaminants *from* the landfill, not the placement of material *into* the landfill, *id.* at 11. The Supreme Court observed, *id.* at 15, n 12:

> The plaintiffs argue that there is an "initial discharge rule," *Woodhaven* at 160-163, and that the lower courts erred by failing to apply it in this case. That is, the plaintiffs want the analysis to focus on the city's placement of pollutants *into* an unlicensed landfill, rather than on the subsequent release of contaminants *from* the landfill. Since intentional disposal of material for years would certainly not be "sudden and accidental," the result in this case would be the same under either analysis. Thus, we do not reach the question.

Following *Clare*, this Court applied the "initial discharge" rule in *Traverse City Light & Power Bd v Home Ins Co*, 209 Mich App 112; 530 NW2d 150 (1995). One of the pollution exclusion clauses at issue in *Traverse City* contained the "neither expected nor intended" language, as do the Home policies we address, the other contained "sudden and accidental" language. *Id.* at 114-115. The plaintiff had disposed of fly ash, a waste material produced by its electrical generation plant, at an abandoned gravel pit from 1975 to 1987. The plaintiff started taking steps to license the facility in the early 1980s and the DNR,

after tests were conducted, denied licensing in 1987. The DNR advised the plaintiff that continued use of the site for fly ash disposal would violate the Solid Waste Management Act, MCL 299.401 *et seq.*; MSA 13.29(1) *et seq.* The DNR issued a cease and desist order in 1988, which required the plaintiff to remediate the groundwater contamination. The plaintiff challenged the order and, after the defendant insurer denied coverage with respect to the order, filed a declaratory judgment action alleging the defendant owed it a duty to defend against the DNR's order. *Id.* at 114. This Court concluded:

> We hold that the initial discharge rule articulated in *Woodhaven* is applicable to the instant case. Accordingly, our analysis focuses on the initial discharge or placement of the materials into the gravel pit, not on their alleged subsequent migration into the soil. If the insured expected or intended the initial discharge (1975-81 policies) or if the initial discharge was not sudden and accidental (1981-84 policy), then there is no coverage. . . .

> *         *         *

> For twelve years, plaintiff arranged to discharge fly ash at the gravel pit at least two times a day. To now claim that plaintiff did not expect or intend this discharge "flies in the face of all reason, common sense and experience." There being no factual dispute that plaintiff expected and intended the initial discharge of the fly ash, as a matter of law, the policies effective from 1975 to 1981 preclude coverage. [*Id.* at 117-119 (citation omitted).]

B

The question is whether the initial discharge rule, applied by the Supreme Court in *Woodhaven*, and by this Court in *Traverse City*, precludes application of the "neither expected nor

intended" exception to the pollution exclusion
under the facts of the instant case. *Woodhaven*
holds that the focus is on the initial discharge
into the atmosphere, and not the subsequent
migration. Thus, when the offending material is
sprayed into the atmosphere (*Woodhaven*) or
placed in a quarry (*Traverse City*), the discharge
has occurred, and the expected course of the
migration is irrelevant. Conversely, where the
contaminants are placed in a container, the
focus is on the release of the contaminants into
the environment from the container.[11] Here, the
initial placement of the contaminants was into
an engineered landfill that was thought to be the
equivalent of a container, but which had no arti-
ficial barrier. We conclude that *Woodhaven* and
*Traverse City* are distinguishable, as is *Clare*,
and that the initial discharge in the instant case
is the discharge from the engineered landfill into
the environment.

In the instant case, in contrast to *Clare* and
*Traverse City*, plaintiff acted within the bounds
of the law, placing the contaminants in a
licensed landfill, believed to be adequate to con-
tain the materials. As the trial court's opinion
notes:

There is no dispute that the County personnel felt that
the landfill was, for its time, "state of the art." The refuse,
which was mostly home waste with some industrial sludge,
was laid directly on the ground. There was no clay liner or
artificial liner of any kind utilized. The evidence indicates
that the designer of the Sparta Landfill believed that a 7-

---

[11] See *Polkow v Citizens Ins Co*, 438 Mich 174, 179; 476 NW2d 382
(1991), and the dissenting opinion by RILEY, J., at 192-194; *Upjohn, supra.*

foot soil barrier between the bottom of the landfill's cell and the ground water was sufficient to contain the waste and any contaminates [sic]. For the purposes of this motion, it is conceded that the County acted in utmost good faith and that the engineering study conducted by it concluded that the site took into consideration the requirements of Act 87 the Public Acts of 199_ [sic].

While the City of Woodhaven intentionally released the contaminants into the environment, although arguably not intending the extent of the dispersal, plaintiff here intended to contain the municipal waste in the Sparta landfill. The contaminants here were not intentionally placed in the environment or atmosphere, but were placed in what was believed to be a properly secured area. In *Woodhaven*, the argument that coverage might apply because the material that was intentionally released into the atmosphere might have been blown suddenly into a house strains the unambiguous words of the policy. In *Woodhaven*, there was no question that the discharge into the environment was intentional, though the damage was unexpected. Here, there is substantial evidence that the discharge into the environment was not expected or intended.

The instant case is also distinguishable from *Traverse City* in that plaintiff's landfill was state of the art for its time, was licensed, and was believed to be capable of containing the waste placed therein. In contrast, the plaintiff in *Traverse City* disposed of its material in an abandoned gravel pit, apparently without regulatory approval. In *Traverse City*, as in *Woodhaven*, although there may not have been an expectation that the contaminants would migrate to the extent they did, the initial discharge into the unli-

censed gravel pit was a discharge directly into the
environment. There is no indication that the gravel pit
in *Traverse City* was engineered to be, or believed to
be, a contained area.

Similarly, in *Clare,* where the Court expressly
declined to address the applicability or application of
the initial discharge rule, concluding that under the
facts of the case the distinction was without conse-
quence, the landfill was unlicensed for a period of
time, and the plaintiff was on notice that it was con-
taminating groundwater, but nevertheless continued
with its disposal. 446 Mich 4-5.

C

None of the three cases relied on by the Court in
*Woodhaven* in applying the initial discharge rule sup-
ports application of the rule to exclude coverage in
the instant case.[12]

---

[12] The *Woodhaven* Court cited *Travelers Indemnity Co v Dingwell,* 414
A2d 220, 225 (Me, 1980), for the proposition that the behavior of the pollu-
tants in the environment, after release, is irrelevant to the application of
the pollution exclusion. 438 Mich 162.

The underlying suit in *Travelers* was a class action seeking damages for
contamination of the nearby residents' well water resulting from
Dingwell's operation of an industrial waste facility. The facts are sketchy,
but the class action complaint alleged in pertinent part:

That among the products processed by the Defendants or utilized
in the business of the Defendant are products containing or pro-
ducing the chemicals trichloroethane, trichloroethylene and
dimethylsulfide. . . .

*	*	*

That as a result of negligence on the part of the Defendant . . .
products containing the aforesaid chemicals permeated the ground
to the ground water table to the properties of the Plaintiffs result-
ing in the contamination of water in the Plaintiffs' wells. [414 A2d
224.]

In the declaratory judgment action regarding insurance coverage, the Maine Superior Court granted summary judgment on the pleadings to the three insurers on the basis of pollution exclusion clauses. *Id.* at 222. Two of the insurers, American Policyholders' Insurance Company (API) and Chicago Insurance Company (Chicago), had "sudden and accidental" clauses in their pollution exclusions, while the third insurer, Travelers Indemnity Company (Travelers), had the following pollution exclusion:

It is agreed that this policy does not apply

(a) to bodily injury or property damage arising out of any emission, discharge, seepage, release or escape of any liquid, solid gaseous or thermal waste or pollutant

(1) if such emission, discharge, seepage, release or escape *is either expected or intended from the standpoint of any insured* or any person or organization for whose acts or omissions any insured is liable. [*Id.* at 223.]

The Maine Supreme Court reversed and remanded for entry of judgment declaring that the insurers had a duty to defend, but did not reach the question of the duty to indemnify. *Id.* at 229. The court held that the Superior Court erred in holding that the Travelers pollution exclusion had the same meaning as the "sudden and accidental" exclusions, noting that "[a] release may be unexpected and unintended, without being sudden and accidental." *Id.* at 223. The court held that the complaint generated a duty to defend because it disclosed a potential for liability within the coverage and contained no allegations of fact that would necessarily exclude coverage. *Id.* at 227. Turning to analysis of the underlying class action complaint, the Maine Supreme Court found that the Superior Court erred in finding that the allegations described "an ongoing, deliberate process":

[T]he Superior Court failed to distinguish between the gradual permeation of the ground, by which the water table was ultimately polluted, and the initial release of the pollutants from Dingwell's facility. The class action plaintiffs, at this point, have no way of knowing how the toxic wastes entered the ground. There may have been either intentional dumping or burial or unintentional spills, leaks, or other accidents. The [negligence] allegations . . . encompass unintentional release into the ground, and do not necessarily describe a "deliberate process." [*Id.* at 224-225.]

The proposition relied on by the Michigan Supreme Court in *Woodhaven,* is in the Maine Supreme Court's discussion regarding the policies' language:

Both pollution exclusions focus on the release of pollutants. The Chicago and API clause reads:

"This policy does not apply . . . to personal injury or damage . . . arising out of . . . discharge, dispersal, release or escape . . . unless sudden and accidental."

The Travelers clause reads

" . . . if . . . emission, discharge, seepage, release escape . . . is either expected or intended."

*The behavior of the pollutants in the environment, after release, is irrelevant to these provisions.* The Superior Court erred in finding that the allegation of permeation of the ground necessarily took Count I out of Chicago and API's exception for "sudden and accidental" releases. It is possible that the releases could have been unexpected and unintended, and thus outside of Travelers' exclusion. [*Travelers, supra* at 225.]

While this case indeed focuses on the initial discharge of the pollutants into the environment, it does not discuss how one determines what is the initial discharge in a case involving an engineered landfill.

*Technicon Electronics Corp v American Home Assurance Co,* 141 AD2d 124, 144; 533 NYS2d 91 (1988), aff'd 74 NY2d 66; 544 NYS2d 531; 542 NE2d 1048 (1989), involved "sudden and accidental" pollution exclusion clauses and intentional, long-term discharge of toxic waste chemicals from Technicon's manufacturing plant into a creek.

A residential community adjacent to the plant sued Technicon for personal injuries allegedly suffered from exposure to toxic chemicals intentionally discharged into the nearby waterway. 74 NY2d 72. The federal Environmental Protection Agency later notified Technicon by letter that it might be potentially responsible for the cleanup of the creek. Technicon notified its insurers, who claimed the pollution exclusion clauses (sudden and accidental) precluded coverage. The lower court granted the insurers' summary judgment motion, holding they had no duty to defend or indemnify Technicon, either against the suit by nearby residents or in connection with any related matter pending before the EPA. 141 AD2d 146. The lower court found that "an intentional discharge will trigger the pollution exclusion regardless of whether the ultimate damages were unintended." *Id.* at 140.

The citation of this case in *Woodhaven* is to the lower court's statement, after an extended discussion on the meaning of "sudden" and "accidental," that

the logical and proper application of the pollution exclusion depends solely upon the method by which the pollutants entered the environment . . . . The relevant factor is not whether the policyholders anticipated or intended the resultant injury or damage, but whether the toxic material was discharged into the environment unexpectedly and unintentionally or knowingly and intentionally. [141 AD2d 144].

Again, while the New York courts focused on the initial discharge into the environment, which was admittedly intentional in *Technicon*, as in *Woodhaven*, the discussion does not assist in determining the proper application of the rule where the pollutants are placed in a landfill believed to be separated from the environment.

The third case cited by the *Woodhaven* Court is *Fireman's Fund Ins Cos v Ex-Cell-O Corp*, 662 F Supp 71 (ED Mich, 1987). This case involved Ex-Cell-O and its subsidiaries' motion for partial summary disposition seeking a declaration that the insurance companies were obligated to defend them against potential liability for allegedly contributing to environmental contamination at a number of locations. The policyholders had received written notice that governmental agencies considered them potentially responsible for the contamination at various sites. The insurers denied coverage.

With regard to the issue of the insurers' denial of coverage under "sudden and accidental" exclusions, the court stated:

Application of the pollution exclusion depends exclusively upon the process by which pollutants entered the environment.   *See Jonesville Products, Inc v Transamerica Insurance Group*, 156 Mich App 508, 512, 402 NW2d 46 (1986) ("The pollution exclusion focuses on the *release* of pollutants . . . .") (emphasis original). The decisive inquiry is not whether the policyholders anticipated property damage, or whether they regularly disposed of hazardous waste, but whether the pollutants entered the environment unexpectedly and unintentionally. [662 F Supp 75-76.]

The court determined the insurers could not rely on the pollution exclusion to deny a defense until they established that the release of pollutants was expected or intended, citing *Jonesville*.

*Jonesville*, which preceded the *Woodhaven* trilogy by five years, involved interpretation of "sudden and accidental" language in a pollution exclusion clause, and was also decided on the pleadings alone. In *Jonesville*, a declaratory judgment action, the underlying complaint alleged that Jonesville had negligently discharged trichlorethylene and other highly toxic chemicals onto its property and that the trichlorethylene subsequently encroached upon the plaintiffs' property. The complaint alleged the pollution and contamination of the plaintiffs' water had been "continuous." The trial court construed the plaintiffs' complaint as alleging "general dumping," which was not sudden and accidental, and concluded that the pollution exclusion applied. This Court reversed the circuit court's determination that the insurer had no duty to defend:

We find that the circuit court failed to distinguish between the frequency of acts which resulted in the release of contaminants and plaintiff's knowledge or notice of the release of pollutants as a result of those acts. The [underlying complainants] did not specify in their complaint how the toxic wastes entered the ground. There

A review of case law in other jurisdictions reveals a split of authority.[13] In *Patz v St Paul Fire & Marine*

---

> may have been either intentional dumping or burial, unintentional spills or leaks from inadequate containers, or other accidents. . . .
> The pollution exclusion focuses on the *release* of pollutants:

> \*    \*    \*

> The circuit court erred in finding that the allegation of "continuous" negligent discharge of waste . . . took Count I . . . out of defendant's exception for "sudden and accidental" release. It is possible that the releases could have been sudden, i.e., unexpected, and accidental, i.e., unintended, and thus outside the exclusion. [156 Mich App 512.]

Neither *Ex-Cell-O* nor *Jonesville* supports the conclusion that the pollution exclusion clause applies in the instant case without regard to the question whether it was expected or intended that pollutants escape from the engineered landfill into the environment.

[13] The cases discussed in this section present a variety of issues arising under various insurance policies. In addition to addressing issues pertinent to this discussion, several address the proper interpretation of the "sudden and accidental" exception to the pollution exclusion, some concluding that the clause contains a temporal element and some concluding that the clause means unexpected and unintended. This dispute has, of course, been resolved in Michigan by *Upjohn*. Other cases address the question whether the pollution exclusion and exception apply to the discharge or the damage, where the insured argues that the focus should be whether the pollution damage was sudden and accidental, or unexpected and unintended, not the discharge itself. In this regard, we think it clear that the focus must be on the discharge, not the damage, in accordance with the clear language of the policy. A related question is whether the unexpected and unintended exception to the exclusion has any meaning in occurrence policies where an occurrence is defined as an exposure or event resulting in unexpected and unintended damage. We think it does. With regard to the discharge/damage distinction and the effect of the "neither expected nor intended" exception to the pollution exclusion, reference to *Woodhaven* is instructive. There, the damage was unexpected and unintended, yet the discharge was intentional. Thus, all provisions of the policy are given effect when construed as follows. There was an occurrence triggering coverage (exposure, and unexpected and unintended damage), a discharge triggering the pollution exclusion (personal injury arising out of the discharge of chemicals into the atmosphere), and an intentional discharge directly into the environment that cannot be regarded as either sudden and accidental, or unexpected and unintended. Thus, while the various cases present differing fact situations and issues, in evaluating their applicability to the instant case, it must be remembered

*Ins Co*, 15 F3d 699, 704-705 (CA 7, 1994), the Seventh Circuit Court of Appeals, in an opinion by Chief Judge Posner, held that placement of contaminated water into evaporation pits lined by soil with no artificial barrier, where it was believed that the wastes were securely confined, was not a discharge of waste into the land; rather, the discharge of the wastes into the environment did not occur until the water leached through the bottom of the pit. The Patz family had a farm equipment manufacturing business on their property. When they decided to paint the farm equipment before selling it, they hired two consulting firms to advise how to dispose of the waste, which included water contaminated by phosphate. Following the consultants' suggestion, the family dug an open pit for the water. The court noted: "The idea, well accepted in the waste-disposal community at the time, was that the water would evaporate, leaving a deposit of phosphate solids that would rest at the bottom of the pit and could be easily removed and used as fertilizer. Because the soil where the pit was to be dug was highly compacted clay soil, the water was expected to evaporate before it could permeate the soil, and so the soil beneath the pit would not be contaminated. . . . All this was done as recommended by the consultants until 1980." *Id.* at 701-702. Wisconsin's DNR became involved, and in 1980 the family discontinued use of the pit. In 1986, the DNR discovered

that (1) in Michigan, sudden and accidental has a temporal element; (2) the instant policies are not sudden and accidental policies but unexpected and unintended policies, so that coverage is restored if the discharge is unexpected or unintended; and (3) in applying the exception to the pollution exclusion, rather than the occurrence language, the discharge into the environment must be unexpected and unintended, rather than the damage.

groundwater contamination from the pit. The Patzes paid $400,000 to clean up this site and another (both were on their property), and sought to recover that amount from St. Paul. St. Paul defended on various bases, including that the deposit of the phosphate-contaminated water in the evaporation pit constituted a discharge of waste materials into the land, and therefore coverage was precluded under the policy because there was a discharge into the land that was not "sudden and accidental." *Id.* at 702.

The *Patz* court reviewed narrow interpretations of pollution exclusion clauses and then opted for what it called an "intermediate" interpretation, "in which the clause is read to distinguish between deliberately discharging waste materials into land, air, or water, whether or not 'harm' is intended [*Woodhaven* and *Traverse City*], and placing those materials in a container that is buried in land or water and subsequently leaks or breaks, discharging waste materials into the land or water surrounding the container." *Id.* at 703. The court went on to find that the pit was "a containing structure."

> The floor of the pit was the soil, so when the phosphatic water was first poured into the pit it was introduced directly into the land with no barrier . . . . But soil is of course a building material. . . . The Patzes' evaporation pit was a containing structure, despite its lack of artificial materials. The Patzes believed (a belief induced by their consultants) that they were taking advantage of the clay composition of the soil to avoid the expense of an artificial bottom for the pit. The clay would stop the water and when the water evaporated, the phosphatic solids would form a crust at the bottom of the pit that would be removed . . . before any harm was done to the soil beneath it. The introduction of the phosphatic water into such a structure is different from just dumping wastes onto land or into a body of

water. The discharge of wastes into the environment did not occur until the water leached through the bottom of the pit; and the leaching was unintended and unexpected. [*Id.* at 704.]

The *Patz* court affirmed the district court's decision in the insured's favor. We recognize that, unlike Michigan, Wisconsin case law holds that the meaning of "sudden and accidental" is unintended and unexpected. *Id.* at 703. However, because the Home policy contains the "neither expected nor intended" language, this difference is not significant.

*Sylvester Bros Development Co v Great Central Ins Co*, 480 NW2d 368 (Minn App, 1992), after remand 503 NW2d 793 (Minn App, 1993), involved groundwater contamination from a landfill established in 1969. In reversing and remanding to the trial court for a determination whether the escape of pollutants *from the landfill into the surrounding groundwater* was sudden and accidental, the court noted:

> When landfills began to be licensed in the late 1960s and early 1970s, landfill operators and even many environmental officials expected the design of a landfill would function to contain pollutants. In particular, the soil beneath landfills was expected to act as a filter to prevent pollutants from migrating into the underlying and surrounding ground and surface waters. Since landfills were expected and intended to contain any wastes placed in them, pollutants deposited in a landfill could only cause property damage if there was a "discharge, dispersal, release or escape" of those pollutants from the landfill into the surrounding environment. *Thus, the deposit of pollutants into a landfill cannot be the triggering event; rather, the "escape" is the critical inquiry for purposes of determining the applicability of the pollution exclusion.* [480 NW2d 373-374.]

On appeal after remand, the court affirmed the grant of summary judgment for the insurer on the basis that seepage from the landfill over two decades was not sudden. 503 NW2d 797.

See also the following cases, cited in *Sylvester*, involving landfills wherein the courts focused on the character of the discharge from the landfill, not the placement of the material into the landfill: *New Castle Co v Hartford Accident & Indemnity Co*, 933 F2d 1162, 1199-1203 (CA 3, 1991), rev'd on other grounds 970 F2d 1267 (CA 3, 1992), the pollution exclusion clause was held to focus on whether the discharge of pollutants (not the resulting damage) was sudden (unexpected) and accidental, and the case was remanded to the district court for consideration whether the county expected the landfill to discharge leachate, *Claussen v Aetna Casualty & Surety Co*, 865 F2d 1217, 1220 (CA 11, 1989), certifying the question to the Georgia Supreme Court whether the sudden and accidental pollution exclusion clause as a matter of law precluded coverage for liability for the environmental contamination caused by the discharge of pollutants from the landfill over an extended period,[14] *United States Fidelity & Guaranty Co v Korman Corp*, 693 F Supp 253, 259-260 (ED Pa, 1988), the pollution exclusion precluded coverage because the underlying complaint alleged that leach-

---

[14] The certified question was answered in 259 Ga 333; 380 SE2d 686 (1989). The court interpreted "sudden and accidental" to mean "unexpected and unintended" and held that coverage was not precluded. Again, any distinction based on the fact that the Michigan courts do not construe sudden and accidental this way is irrelevant because the Home policy used the unexpected and unintended language. Additionally, regardless of the words used, the courts focused on the discharge from the landfill, not the placement of the material in the landfill.

ing and discharge from the landfill was not sudden but, rather, occurred continually over a long time, and *Lower Paxton Twp v United States Fidelity & Guaranty Co*, 383 Pa Super 558, 578; 557 A2d 393 (1989), focusing on whether the emission of methane gas from a landfill, a by-product of the natural decomposition of organic material in the refuse buried at the landfill, was sudden and accidental.

Other cases supporting this view are *FL Aerospace v Aetna Casualty & Surety Co*, 897 F2d 214, 220 (CA 6, 1990), affirming judgment in the defendant insurer's favor, on factual basis, but noting that sudden and accidental exception applies to discharge of pollutants into the environment, and that the pertinent discharge was not the storage of the waste at the industrial waste site, and *Queen City Farms, Inc v Central Nat'l Ins Co*, 64 Wash App 838, 884-887; 827 P2d 1024 (1992), aff'd in pertinent part and remanded in part 124 Wash 2d 536; 882 P2d 703 (1994), holding that the relevant polluting event is the discharge or escape into the environment and that where material was deposited in a place that it was believed would contain or filter the material, the polluting event is the escape from that place.

In *FL Aerospace*, the Sixth Circuit Court of Appeals stated:

> We cannot agree with Aetna's position that simply because Berlin & Farro transported some 500,000 gallons of Midland-Ross waste to the Berlin & Farro site over a period of years, any discharges cannot be considered sudden and accidental. The "sudden and accidental" exception applies to the discharge, release, dispersal or escape of pollutants into the environment. Mere delivery of waste for storage at

a facility that is licensed to store waste is not a discharge of
pollutants into the environment. [897 F2d 220.][15]

In *Queen City Farms*, the plaintiff, QCF, had a waste
disposal site on its property from which hazardous
wastes leaked and contaminated the groundwater.
QCF brought a declaratory judgment action against its
insurer seeking to recover costs of cleanup. Among
other issues, the Washington Supreme Court
addressed the pollution exclusion clause:

> QCF urges the court to focus on the leakage from the pits,
> and not the initial disposal into the pits. The insurers urge
> the court to focus on the initial disposal into the pits.
>
> . . . One construction of the [discharge, dispersal, release
> or escape into or upon land] language is that it includes the
> dumping of the wastes "upon" the land . . . .
>
> *However, the terms "discharge," "dispersal," "release,"
> and "escape," have plain, ordinary, popular meanings
> which indicate that the initial disposal into the pits is not
> the relevant event.*"Discharge" has as one meaning "to give
> outlet to: pour forth," and "a flowing or issuing out. . . ."
> [*Webster's Third New International Dictionary* (1981)] at
> 644. This definition may apply to mean the release from the
> pits. "Dispersal" is "the act or result of dispersing." *Web-
> ster's*, at 653. "Disperse" includes the meaning "to spread or
> distribute from a fixed or constant source. . . ." *Webster's*, at
> 653. "Escape" is "the act of escaping or the fact of having
> escaped: as . . . leakage or outflow esp. of steam or a liquid.
> . . ." *Webster's*, at 774. "Release" includes "to set free from
> restraint, confinement, or servitude. . ." and "discharge from
> restraint. . . ." *Webster's*, at 1917.
>
> These are not the only dictionary definitions, but they are
> popular meanings which have in common the notion of an

---

[15] We note that *FL Aerospace* was decided after the Court of Appeals
decided *Woodhaven* and before the Supreme Court's initial denial of leave,
and later grant and reversal, in *Woodhaven*. Nevertheless, the court
focused on the discharge into the environment.

escape or release from confinement, or the dispersal from a fixed place. They apply well to the migration of the wastes from the pits into the groundwater. They do not apply well to disposal into the pits. [124 Wash 2d 562-563 (emphasis added).][16]

The contrary view, that only the initial discharge, i.e., the placement of matter into or upon the land, is relevant for purposes of interpreting pollution exclusion clauses, is expressed in *Broderick Investment Co v Hartford Accident & Indemnity Co*, 954 F2d 601, 607 (CA 10, 1992), holding that placement of waste materials into holding containment ponds was a discharge into or upon the land within the meaning of the pollution exclusion clause, even if damage to the groundwater was not an intended result. "[W]hether BIC intended the waste to seep into groundwater and cause damage after the initial discharges into the land

---

[16] The *Queen City Farms* court further observed, after discussing *Sylvester*, 480 NW2d 373-374, that

[t]he technology and understanding of the safety and containment characteristics of waste disposal sites then and now are far different. It seems to us that an average purchaser of insurance in earlier years would have been justified in thinking that there was coverage for the placement of wastes into a waste pit, or a landfill, which was expected to contain the wastes and from which it was not expected that they would discharge, disperse, release, or escape into the groundwater, or from which it was believed that the waste materials would be safely filtered. That is, the average purchaser of insurance would have understood that mere placement of wastes into a place which was thought would contain or filter the wastes would have not been an event which would fall within the exclusion. We therefore hold that the relevant polluting event is the discharge, dispersal, release, or escape of toxic material into the environment, and where material has been deposited in a place which was believed would contain or safely filter the material, such as a waste disposal pit or sanitary landfill, the polluting event is the discharge, dispersal, release, or escape from that place of containment into or upon the land, the air or water, including groundwater. [124 Wash 2d 564-565.]

is not relevant." In *Oklahoma Publishing Co v Kansas City Fire & Marine Ins*, 805 F Supp 905, 910 (WD Okla, 1992), the court followed *Broderick, supra,* and focused on the discharge of waste at a waste disposal site in a suit against the generator of hazardous waste, which had the waste transported to a waste site and a landfill. A third case expressing this view, but distinguishing the facts from *Patz,* is *St Paul Fire & Marine Ins v Warwick Dyeing Corp*, 26 F3d 1195, 1203-1205 (CA 1, 1994), the relevant discharge is the disposal of hazardous wastes into the landfill, and the release of substances into the environment was not a separate event constituting an independent discharge. The First Circuit Court of Appeals in *St Paul* distinguished the facts presented there from the facts in *Patz:*

> Nothing in the record supports this contention that the L & RR landfill was a containment vessel such that discharges into it would not constitute a discharge "into or upon land." The EPA did state that the landfill "releases" hazardous substances "to the environment," but this simply describes the property damage resulting from the discharge of waste into the landfill. *There is no indication the EPA* considered the landfill to be a containment vessel from which hazardous substances escaped. To the contrary, the object of the *EPA's* concern in its 87 page order is the fact that hazardous substances were placed in the L & RR landfill to begin with, not the failure of the landfill to contain wastes or the failure of some party to properly operate and maintain the landfill.
>
> We are not presented with a situation like the one recently discussed by Judge Posner in *Patz,* where the insured intended its disposal pit to serve as a containment vessel due to its clay bottom. *Patz,* 15 F3d 703-05. In that case, Judge Posner found cause to believe there may have been a separate unexpected discharge of pollutants subsequent to the placement of waste into the pit. The waste in

this case, however, was removed from its containers on Warwick's premises and placed into the landfill-literally onto the land-where it later caused contamination. We presume all parties involved expected this to be an acceptable practice, *but we see no evidence that the landfill was expected to act as a containment vessel.* [See *Broderick*, 954 F2d 607, n 5.] We therefore reject Warwick's contention that there exists some unexpected and unintended discharge of its wastes triggering the exception to the pollution exclusion. Instead, we agree with the district court to the extent it found the pollution exclusion applicable because Warwick's discharge of waste was expected and intended and thus not "accidental." [26 F3d 1205 (emphasis added).][17]

---

[17] The following cases cited in *St Paul* are also distinguishable:

*Mays v Transamerica Ins Co*, 103 Or App 578; 799 P2d 653 (1990), affirming summary judgment for the insurers on the insured's breach of contract claim seeking indemnification under general liability policies for costs of environmental cleanup. The insured formerly owned property on which she operated a paint manufacturing business that generated waste consisting of used solvent, water, and paint sludge, which was deposited in an unlined pit dug for the purpose of holding the waste. Although it appears that the insured did not intend the waste to move into the groundwater, there is no indication that the unlined pit was expected to act as a containment vessel.

*A Johnson & Co, Inc v Aetna Casualty & Surety Co*, 933 F2d 66 (CA 1, 1991), affirming the grant of summary judgment to the insurers regarding the duty to defend and indemnify the insured applying sudden and accidental pollution exclusion clause. The facts were clear that the contamination of the site arose because of continuing disposal practices, including direct discharge to the ground and leakage from multiple tanks in poor condition.

*Hartford Accident & Indemnity Co v U S Fidelity & Guaranty Co*, 962 F2d 1484 (CA 10, 1992), affirming the district court's grant of the insurer's summary judgment motion and its finding that continuous or routine discharges are not covered, construing "sudden and accidental" under Utah law to mean temporarily abrupt and unexpected and unintended.

The parties agreed the insured was unaware its oil contained PCBs, that it intentionally discharged liquid wastes containing PCBs directly onto the ground and into unlined earthen pits, some of which had overflow pipes that carried the wastes into the surrounding environment, and that it did not expect or intend that water in or leaving the pits would contain PCBs. *Id.* at 1486, 1487. Thus, while the damage may have been unintended, the discharge into the environment was not. The intentional disposal of liquid

wastes onto the ground and into the unlined pits with overflow pipes was the discharge into the environment. Also see *Pepper's Steel & Alloys, Inc v United States Fidelity & Guaranty Co,* 668 F Supp 1541, 1549 (SD Fla, 1987), a similar case in which the court reached a contrary result, holding that there was coverage notwithstanding the pollution exclusion.

*Northern Ins Co of New York v Aardvark Associates, Inc,* 942 F2d 189 (CA 3, 1991), affirming the district court's grant of summary judgment to the insurers on the ground the insured failed to make showing that discharges were sudden and accidental. Underlying EPA complaint and related administrative allegations portrayed a process of pollution occurring over many years: "many different . . . environmental violations had occurred . . . and had 'continued throughout the operation of the landfill.' " *Id.* at 196. (Citation omitted.)

*Hybud Equipment Corp v Sphere Drake Ins Co,* 64 Ohio St 3d 657; 597 NE2d 1096 (1992), reversing a determination that the insurer was obligated to defend the three insureds, on basis that coverage was precluded by sudden and accidental clause, and declining to find the term sudden and accidental ambiguous.

Former owner of a licensed landfill and a transporter of waste material from commercial and industrial entities to the landfill were sued by a neighboring property owner, the EPA and the State of Ohio because of leakage of pollutants from the landfill into soil, groundwater, air, and nearby residential wells. The insurers defended on the basis of pollution exclusion. *Id.* at 1098. The court noted that the complaints alleged disposal or acceptance of wastes in the landfill over an extended period, and held that the sudden and accidental exception was never invoked because none of the three underlying complaints alleged that the release or discharge of the waste happened abruptly or instantaneously. *Id.* at 1103.

The first underlying complaint alleged that as a result of damage to storage containers, various chemicals had escaped into the air, soil, and groundwater over a fourteen-year period. The second alleged that the landfill had accepted various waste materials over a twelve-year period, even though it had failed to install an impenetrable liner to halt any leakage of waste. The third action alleged that, as a result of the manner in which waste had been handled, a leachate had been generated and was seeping into the ground and surface waters along with other hazardous waste, and that this had been going on for over a decade. *Id.* at 1097. Thus, under no construction of the facts could the discharge be regarded as sudden and accidental. The case does not directly address the issue of the relevant discharge.

*Liberty Mutual Ins Co v Triangle Industries, Inc,* 957 F2d 1153 (CA 4, 1992), affirming the district court's grant of the insurers' summary judgment motions on the ground that Triangle Industries intended the discharge of its toxic sludge upon the ground of a landfill and therefore discharge was not accidental, although damage may have been unintended.

The court noted "for purposes of this appeal there is no dispute that the environmental damage in this case arose from the discharge of pollutants upon the land." *Id.* at 1157. The court rejected Triangle's argument that "sudden and accidental" applied to the pollution *damage*, rather than to the *discharge*. The court noted that no evidence was presented that Triangle did not expect and intend its sludge to be dumped upon the ground at the landfill, that the sludge was a normal by-product of Triangle's manufacturing operation, and that it hired trucks to haul the waste. "Given this, we agree with the district court that the open dumping of a sludge onto the ground, particularly when performed as part of a regular business activity, cannot be considered an accidental discharge of the contaminant." *Id.* at 1158. The court's analysis focused on the discharge/damage distinction, concluding that the sudden and accidental character of the discharge, rather than the damage, is relevant, a conclusion with which we are in complete accord. It was never argued that the landfill was expected to contain the sludge, and that there was a later sudden and accidental (or unexpected and unintended) discharge into the environment.

*Liberty Mutual Ins Co v SCA Services, Inc,* 412 Mass 330; 588 NE2d 1346 (1992), reversing orders granting SCA's motion for summary judgment and ordering that summary judgment be entered for the insurers, finding the sudden and accidental pollution exclusion clause precluded coverage. The underlying complaint alleged SCA arranged to dispose of several thousand barrels of industrial and chemical wastes, many containing "hazardous substances," and that SCA knew or should have known these wastes were noxious, dangerous, hazardous substances and that the wastes were deposited directly into the ground at the site in trenches dug for that purpose. *Id.* at 333. The court concluded the pollution alleged was not sudden, noting that the complaint "details routine business activity lasting over several months in which the toxic contents of the barrels brought by SCA to the landfill were either emptied into open trenches or dumped into trenches and flattened with a bulldozer." *Id.* at 336. Rejecting SCA's argument that the discharges were sudden because, as the barrels were crushed or emptied, the commencement of the release from each barrel was abrupt, the court noted that a discharge that continues for an extended period would likely cease to be accidental or sudden. Again, the facts demonstrate that the discharge of the toxic waste into the trenches was the discharge into the environment. There was no allegation that the trenches were designed to contain toxic wastes.

*Borg-Warner Corp v Ins Co of North America,* 174 AD2d 24; 577 NYS2d 953 (1992). The plaintiff sought defense and indemnification for claims arising out of its disposal of hazardous industrial waste at nineteen sights off its property, over periods ranging from two years to four decades. In addition, the plaintiff was sued for groundwater contamination from its manufacturing facility.

The court held that the liability arising out of the long-term, intentional disposal of the plaintiff's industrial waste was not covered under the sud-

den and accidental exception, because the discharges were over a number of years and thus not sudden. Further, the court rejected as irrelevant the plaintiff's argument that the discharges were accidental because the plaintiff did not expect the pollution, noting that the pollution exclusion clause " 'excludes from coverage liability based on all *intentional* discharges of waste whether consequential damages were intended or unintended.' " *Id.* at 32, quoting *Technicon Electronics Corp v American Home Assurance Co,* 74 NY2d 66, 75; 544 NYS2d 531; 542 NE2d 1048 (1989). In discussing the pollution exclusion, the court did not address whether the various landfill sites were engineered to contain the hazardous industrial waste. Rather, the focus was on the intentional discharge/unintended damage distinction. It was assumed that the intentional discharge of waste into the landfill was the discharge into the environment.

*G Heileman Brewing Co v Royal Group, Inc,* 779 F Supp 736 (SD NY, 1991), aff'd without opinion 969 F2d 1042 (CA 2, 1992), after discussing the *Upjohn* trilogy, the court granted summary judgment for the insurers, applying *Woodhaven's* initial discharge rule to the dumping of waste directly into unlined pits at a waste site.

The plaintiff sought indemnification for costs of cleanup of the Otisville, Michigan state-approved toxic waste dump. The plaintiff's predecessor, a beer brewer and distributor, had employed a waster hauler to transport used bottle wash to the site in the 1970s. In 1985 and 1986, the EPA notified companies that had used the dump that they were potentially responsible parties.

One of the plaintiff's arguments was that to determine coverage the focus should not be "on the release of waste into containment, but on how the waste was released into the environment." *Id.* at 740. The court concluded that the *Upjohn* trilogy required that summary judgment be entered in the insurers' favor:

> The parties do not dispute . . . that a waste hauler employed by plaintiff deposited waste into unlined earthen lagoons at the site. The record also indicates that the waste was not artificially contained, as in *Upjohn,* but that it was dumped into earthen pits at the site. While plaintiff has recently attempted to make an issue out of whether it has conceded that the pits were lined or unlined, plaintiff failed to put any evidence into the record to prove that the lagoons were lined, and never disputed indications in the record that the pits were unlined.

*   *   *

> In sum *Woodhaven* teaches that *the Court is to focus on the initial discharge of waste into the environment; here, that discharge was the dumping of waste directly into pits in the earth at the Otisville dump.* The record indicates that the discharge was not sudden, as that word was defined in *Upjohn,* because waste was deposited repeatedly over an extended period of time. The record

Thus, courts have come to a variety of conclusions in cases presenting similar fact situations and issues. We conclude that *Patz* presents a fact situation most analogous to the instant case, and that its analysis is sound.

In summation, application of the pollution exclusion requires that the court focus on the initial discharge into the environment. If that discharge is intended, there is no coverage, notwithstanding that the damage may have been unintentional. If waste materials are placed in a contained area or structure and later escape into the environment, the latter discharge is the relevant discharge. In the instant case, the relevant discharge is the release of the pollutants from the landfill. We therefore remand for a determination whether plaintiff either expected or intended the discharge, dispersal, release, or escape of contaminants or pollutants into the environment from the Sparta landfill.[18] Coverage cannot be excluded until this is determined. Home has a duty to defend until

---

also indicates that the discharge was not accidental because the waste was deliberately dumped into the earth. Accordingly, the pollution exclusion precludes coverage in this case. [*Id.* at 740.]

In *Heileman*, while the landfill was licensed, there was apparently no contention that it was designed to be a containment facility. The court clearly concluded that the discharge into the earthen pits was the discharge into the environment. Such a conclusion is not compelled in the instant case.

With regard to *Heileman* and *Borg Warner*, see, on a related point, *Nestle Foods Corp v Aetna Casualty & Surety Co*, 842 F Supp 125, 131-132 (D NJ, 1993), where the court held the pollution exclusion did not apply because there was no discharge by the insured.

[18] The facts recited earlier in this opinion are as viewed most favorably to plaintiff. Home presents additional facts and draws inferences less favorable to plaintiff. Thus, there are factual issues to be resolved on remand.

coverage under the policies is excluded. *Polkow,*
*supra.*

V

Plaintiff next argues that Home's primary compre-
hensive general liability policies' personal injury
endorsement affords it coverage without regard to the
pollution exclusion. The pertinent provision states:

> This Company will pay on behalf of the Insured all sums
> which the Insured shall become legally obligated to pay as
> damages because of injury (herein called "personal injury")
> arising out of one or more of the following offenses:
>
>           *     *     *
>
> Group C-wrongful entry or eviction, or other invasion of
> the right of private occupancy.

Plaintiff's argument is that the claims of the State of
Michigan, as embodied in the administrative action
taken against Kent County by the DNR, arise out of
Kent County's alleged contamination of the state's
groundwater, and the alleged groundwater contamina-
tion constitutes a wrongful entry or trespass on the
rights of the people of Michigan in the groundwaters
of the state.

The trial court ruled that Home's policies' personal
injury liability endorsement did not afford coverage:

> First of all, whether or not in the right case the personal
> injury may or may not apply is not what you have in front
> of you. What you have here is basically-What we've got to
> keep in mind is the DNR says, "Maybe we've got to do some-
> thing. Maybe sometime in the future-maybe clean up this
> mess down there." I don't see that as a personal
> endorsement.

If we have one of the home owners coming in here and saying, "You've got to clean up my yard, because I got muck in my yard" or something like that, then you have a better argument. But looking at it right here. I'm going to rule that there is no coverage under the personal injury endorsement.

We believe the trial court's ruling was correct, because the case before us does not involve the infringement of a private right of occupancy, but, rather, involves a site-remediation request from a governmental regulatory agency.

The "Group C" offenses, by the explicit terms of the policies, must affect a right of private occupancy. The two torts enumerated, wrongful entry and eviction, involve disputes over possessory interests in real property.[19] There is neither a private occupancy right nor a possessory interest dispute here. Assuming the people of Michigan own the groundwater, as plaintiff argues, a public right would be involved.

This reasoning is supported by the district court's decision in *Harrow Products, Inc v Liberty Mutual Ins Co*, 833 F Supp 1239 (WD Mich, 1993), aff'd in part, rev'd in part, and remanded 64 F3d 1015 (CA 6, 1995). Harrow Products owned and operated a manufacturing plant that was identified as the cause of groundwater contamination. After the DNR notified Harrow that it was in violation of the Water Resources Commission act, MCL 323.1 *et seq.;* MSA 3.521 *et seq.*, the village in which Harrow was located sought damages and recovery of response costs under

---

[19] With regard to eviction, see 15 Callaghan's Michigan Civil Jurisprudence, Landlord and Tenant, § 28, p 347, and 52 CJS, Landlord and Tenant, § 445 *et seq.*, and with regard to wrongful entry, see 52A CJS, Landlord and Tenant, § 727.

the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 USC 9601, and the Michigan Environmental Protection Act, MCL 691.1201 *et seq.*; MSA 14.528(201) *et seq.* The federal district court found that the pollution exclusion clauses of the insurance contracts barred coverage because the contamination was not sudden and accidental. Harrow also raised the issue raised in this case regarding whether there was coverage under an identically worded personal injury endorsement for injury to the groundwater because the contamination was a wrongful entry or eviction, or other invasion of the right of private occupancy "enjoyed by the people of the Village of Saranac and of the State of Michigan." 833 F Supp 1245. The district court found the endorsement inapplicable:

> Here, there is no reasonable basis for concluding that the liability Harrow Products is or may be made to bear in the MDNR administrative proceedings or in the Village of Saranac action is the result of wrongful entry or eviction or other invasion of the right of *private occupancy.* That these terms are used to define *"personal* injury," and are included among other torts or offenses to personal rights, such as false arrest, malicious prosecution, defamation and invasions of privacy, indicates that they pertain to a person's right to actually possess, inhabit or occupy real property. Here, unlike the *Titan* [*Holdings Syndicate, Inc v City of Keene, New Hampshire*, 898 F2d 265 (CA 1, 1990)], *Pipefitters* [*Welfare Educational Fund v Westchester Fire Ins Co*, 976 F2d 1037 (CA 7, 1992)] and *Hirschberg* [*v Lumberman's Mutual Casualty*, 798 F Supp 600 (ND Cal, 1992)] cases, no showing has been made that Harrow Products is threatened with liability for interfering with property owners' or occupants' rights of private occupancy. No private occupants of property have filed claims in either action. Nor has the MDNR or Village of Saranac asserted claims as subrogees of, or in some other representative capacity for, occupants of

property. The MDNR and Village of Saranac actions, asserting claims under the Michigan Water Resources Commission Act, the Michigan Environmental Protection act, and CERCLA based on the "people's" interest in uncontaminated ground-water, cannot reasonably be characterized as premised upon interference with rights of private occupancy. [833 F Supp 1246 (emphasis in original).]

The Sixth Circuit Court of Appeals affirmed on somewhat broader grounds, concluding that the Michigan Supreme Court would hold that the pollution exclusion clause bars coverage under the personal injury endorsement.[20] 64 F3d 1021-1025.

Plaintiff relies on *Scottish Guarantee Ins Co v Dwyer*, 19 F3d 307 (CA 7, 1994), *Pipefitters, supra*, *Titan, supra*, and *American States Ins Co v Canyon Creek*, 786 F Supp 821 (ND Cal, 1991), in support of its position. However, each of these cases involves a private plaintiff seeking redress for interference with private property rights.[21] Here, while there was a private action by adjoining landowners, Home defended and settled the action and the instant case involves only potential governmental site-remediation requirements. Nor do *State of New York v Shore Realty Corp*, 759 F2d 1032 (CA 2, 1985), and *In re Acushnet River & New Bedford Harbor: Proceedings re Alleged PCB Pollution*, 712 F Supp 994 (D Mass, 1989), establish coverage. That the CERCLA is based on common-law

---

[20] We need not reach the broader question whether any pollution-related claims are covered under the personal injury endorsement, which unlike the bodily injury and property damage coverage section does not contain a pollution exclusion provision, because we conclude the governmental claims at issue here are not covered.

[21] Similarly, *Northrop Corp v American Motorists Ins Co*, unpublished opinion of the Superior Court of the State of California for the County of Los Angeles, filed April 8, 1992 (Docket No. C 710571), relied on by plaintiff, also involves a private plaintiff.

duties does not mean that a right of private occupancy is involved in the instant case.

Plaintiff also relies on *City of Edgerton v General Casualty Co*, 172 Wis App 2d 518; 493 NW2d 768 (1992). The Wisconsin Court of Appeals opinion in *Edgerton* does, indeed, support plaintiff's position that the personal injury endorsement provides coverage for governmental remediation requests because groundwater contamination invades a right of private occupancy. However, *Edgerton* was reversed in part by the Wisconsin Supreme Court, 184 Wis 2d 750; 517 NW2d 463 (1994). The Wisconsin Supreme Court, stating that the case involved, among other issues, the question whether "the personal injury provisions of an insurance policy provide coverage for environmental cleanup costs when then has been no allegation of wrongful entry, eviction, or other invasion of the right to private occupancy," did not reach this issue, concluding that summary judgment should be entered in favor of the insurers on the ground that there was no duty to defend because no suit for damages was presented, and thus there was no need to "further analyze" the personal injury provisions. *Id.* at 757, 758. We do not find the Wisconsin Court of Appeals decision in *Edgerton* persuasive with regard to the private right issue.

We conclude the trial court correctly determined that the personal injury liability endorsement in Home's primary policies did not afford coverage for the governmental requests that plaintiff remediate the site.

Affirmed with regard to Great American Insurance Company and the Home Insurance Company excess

liability policies. Reversed and remanded with regard to the Home Insurance Company primary policies.

L.F. SIMMONS, JR., J., concurred.

HOLBROOK, JR., P.J. I concur in the result only.